## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

BEVERLY STAYART,
a/k/a BEV STAYART,
an individual,

                                       Case No. 10-CV-0336-LA

        Plaintiff,

v.

GOOGLE INC.,
A Delaware corporation,

        Defendant.

## GOOGLE INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS
## MOTION TO DISMISS PLAINTIFF'S COMPLAINT

James D. Peterson
Wisconsin State Bar No. 1022819
Jennifer L. Gregor
Wisconsin State Bar No. 1078174

GODFREY & KAHN, SC
One East Main Street
P.O. Box 2719
Madison, WI 53701-2719
Telephone: 608.257.3911
Facsimile: 608.257.0609
E-mail: jpeterson@gklaw.com
Email: jgregor@gklaw.com

*Attorneys for defendant Google Inc.*

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................1

STATEMENT OF FACTS ........................................................................................2

ARGUMENT ...........................................................................................................6

    I.    The Complaint should be dismissed under Rule 12(B)(6) because Stayart has not stated a claim that is plausible on its face. ..................................................6

    II.    Stayart's right of publicity claim fails because Google has not used Stayart's name "for advertising purposes or for purposes of trade." ...............................8

        A.    Wisconsin's right of publicity, under both the statute and common law, applies only to use "for advertising or for purposes of trade." ............................8

        B.    The phrase "*for advertising purposes or for purposes of trade*" is narrowly construed to mean direct commercial exploitation. .............................9

            1.    Wisconsin courts have limited the right of publicity to claims involving direct commercial exploitation. ...................................10

            2.    The right of publicity does not prohibit the use of a person's name or likeness in connection with communications on matters of legitimate public interest, even if those communications are commercially motivated. ...............................................................12

            3.    Precedent from other jurisdictions illustrates how the meaning of "for advertising or for purposes of trade" limits right of publicity claims to those involving direct commercial exploitation. ........................14

        C.    Google's use of Stayart's name is not for direct commercial exploitation, but to facilitate communication on matters of legitimate public interest............17

            1.    The Google Suggest feature does not use Stayart's name for advertising or trade purposes. ...................................................17

            2.    Google does not use Stayart's name or likeness for advertising or trade purposes for keywords or for its Sponsored Links. .........................18

            3.    Google does not use Stayart's name or likeness for advertising or trade purposes in its "Related Searches." ...................................22

III. Stayart's interpretation of Wisconsin's right of publicity would violate the First Amendment. ............................................................................................................. 23

    A.    The First Amendment limits the right of publicity. ........................................... 23

    B.    Stayart's interpretation of the right of publicity would cripple the operation of Internet search engines, and restrict access to information. .......... 26

CONCLUSION .................................................................................................................... 27

**TABLE OF AUTHORITIES**

Page

**Cases**

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ..................................................... 7, 19, 20, 21

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) .................................................. 7

*Beverley v. Choices Women's Med. Ctr.*, 78 N.Y. 2d 745 (1991) ................................. 15

*Carlson Heating, Inc. v. Onchuck*, 104 Wis. 2d 175, 311 N.W.2d 673 (Ct. App. 1981) ............. 15

*Conley v. Gibson*, 355 U.S. 41 (1957) ....................................................................... 7

*Conrad v. Madison Festivals, Inc.*, 2009 WL 3018031 (W.D. Wis. Sept. 15, 2009) ................... 12

*Cubby, Inc. v. CompuServe, Inc.*, 776 F. Supp. 135 (S.D.N.Y. 1991) ......................................... 25

*Deputy v. Lehman Bros.,* 374 F. Supp. 2d 695 (E.D. Wis. 2005) .................................................... 9

*Doe v. TCI Cablevision*, 110 S.W.3d 363 (Mo. 2003), *aff'd* sub nom. *Doe v. McFarlane*, 207 S.W.3d 52 (Mo. Ct. App. 2006) .......................................................................... 13

*Donahue v. Warner Bros. Pictures Distributing Corp.*, 2 Utah 2d 256, 272 P.2d 177 (Utah 1954) ........................................................................................................ 13

*Edgenet, Inc. v. Home Depot U.S.A., Inc.*, 2010 WL 148389 (E.D. Wis. Jan. 12, 2010) .............. 6

*ETW Corp. v. Jireh Publ'g, Inc.,* 332 F.3d 915 (6th Cir. 2003) .......................................... 24

*Gautier v. Pro-Football, Inc.*, 99 N.Y.S. 2d 812 (N.Y. City Ct. 1950); *rev'd* 106 N.Y.S.2d 553 (N.Y. App. Div. 1951), *aff'd*, 304 N.Y. 354 (1952) ................................... 15, 16

*Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400, 114 Cal. Rptr. 2d 307 (Cal. App. 2001) ................................................................................................. 14

*Green v. Warden, U.S. Penitentiary*, 699 F.2d 364 (7th Cir. 1983) ............................................... 2

*Hannigan v. Liberty Mutual Ins. Co.*, 230 Wis. 2d 746, 604 N.W.2d 33, 1999 WL 667303 (Wis. Ct. App. Aug. 26, 1999) ...................................................................... 9, 11

*Hirsch v. S.C. Johnson & Son, Inc.*, 90 Wis. 2d 379, 280 N.W.2d 129 (1979) ............ 9, 10, 13, 16

*Kline v. Robert M. McBride & Co.,* 170 Misc. 974, 11 N.Y.S.2d 674 (New York 1939) ............ 14

*Ladd v. Uecker*, 2010 WI App 28, 780 N.W.2d 216 (Ct. App. 2010) .............................. 11, 14, 18

*Leary v. Punzi*, 687 N.Y.S.2d 551 (N.Y. Sup. Ct. 1999) .............................................. 16

*Leidholdt v. L.F.P., Inc*., 860 F.2d 890 (9th Cir. 1988) ................................................ 16

*Menomonie Indian Tribe of Wisc. v. Thompson*, 161 F.3d 449 (7th Cir. 1998) ............................ 2

*Montana v. San Jose Mercury News, Inc*., 40 Cal. Rptr. 2d 639 (Ct. App. 1995) ................. 24, 25

*Moser v. Press Pub. Co*., 109 N.Y.S. 963 (N.Y. Sup. Ct. 1908) .................................... 15

*Onassis v. Christian Dior-New York, Inc*., 472 N.Y.S.2d 254 (N.Y. Sup. Ct. 1984), aff'd,
    110 A.D.2d 1095 (App. Div. 1985) ......................................................... 12

*Rand v. Hearst Corp*., 298 N.Y.S.2d 405 (N.Y. App. Div. 1969), aff'd, 257 N.E.2d 895
    (N.Y. 1970) ............................................................................ 17

*Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989) ....................................................... 13

*School of Visual Arts v. Kuprewicz*, 771 N.Y.S.2d 804 (N.Y. Sup. Ct. 2003) ...................... 15, 16

*Seale v. Gramercy Pictures*, 949 F. Supp. 331 (E.D. Pa. 1996) ...................................... 26

*Simeonov v. Tiegs*, 602 N.Y.S.2d 1014 (N.Y. City Ct. 1993) ......................................... 16

*State v. Reed*, 695 N.W.2d 315 (Wis. 2005) ........................................................ 10

*Stayart v. Yahoo! Inc*., 651 F. Supp. 2d 873 (E.D. Wis. 2009) ...................................... 3

*Stayart v. Yahoo! Inc*., No. 2:10-cv-00043-LA (E.D. Wis. filed Jan. 19, 2010) ................... 3, 19

*Stern v. Delphi Internet Services Corp*., 626 N.Y.S.2d 694 (N.Y. Sup. Ct. 1995) ............... 24, 25

*Szabo v. Bridgeport Machs., Inc*., 249 F.3d 672 (7th Cir. 2001) .................................... 6

*Williams v. Midwest Airlines, Inc*., 321 F. Supp. 2d 993 (E.D. Wis. 2004) ....................... 2

*Young v. Grenker Studios, Inc.*, 26 N.Y.S.2d 357 (N.Y. Sup. Ct. 1941) ............................. 16

*Zacchini v. Scripps-Howard Broadcasting Co*., 433 U.S. 562 (1977) ............................... 23

### Statutes

47 U.S.C. § 230 ........................................................................................ 3

Wis. Stat. § 995.50 (enacted in 1977 as Laws of 1977, Ch. 176) ................................. 8

Wis. Stat. § 995.50(2)(b) (2007-08) ............................................................... 9, 14

Wis. Stat. § 995.50(3) ............................................................................... 9

# Other Authorities

1 J. Thomas McCarthy, *The Rights of Publicity and Privacy* § 6:131 (2d ed. 2010) ..................... 8

*2 B Norman J. Singer, Statutes and Statutory Construction* § 52:2 (7th ed. 2007)..................... 15

2 J. Thomas McCarthy, *The Rights of Publicity and Privacy* § 8:69 (2d ed. 2010) ..................... 26

Judith Endejan, *The Tort of Misappropriation of Name or Likeness Under Wisconsin's New Privacy Law*, 1978 Wis. L. Rev. 1029 (1978) ................................................................... 8

Legislative Council Memorandum, "*Important Cases and Events in the Development of the Law of Privac*y" ...................................................................................................... 15

## INTRODUCTION

Beverly Stayart's complaint should be dismissed for failure to state a claim because Google Inc.'s ("Google") use of her name is not "for advertising purposes or for purposes of trade," which is a required element of a claim under Wisconsin's right of publicity law. The use of a person's name as a search term on Google does not violate that person's right of publicity any more than if the name appeared in a phone book, or a library card file. And the fact that some people have used Google to search for the plaintiff's name in conjunction with Levitra or other terms that she finds offensive does not make the search engine's results "for advertising purposes or for purposes of trade" either.

Stayart uses the Internet as a platform to publish her work on genealogy and animal rights, but she is most well known as a litigant. For more than a year she has been contesting Yahoo!'s use of her name in connection with its key word advertising, which she contends has wrongly linked her name to Levitra and other sexual dysfunction treatments. After this Court dismissed Stayart's suit against Yahoo!, she appealed to the Seventh Circuit and then filed a second suit against Yahoo! Stayart's persistent litigation against Yahoo! and her novel legal theories have not gained much traction in this Court, but they attracted significant attention among Internet commentators. Thus, as a result of her lawsuits against Yahoo!, the potential connection between "Beverly Stayart" and "Levitra" has become a matter of significant and legitimate public interest, which Google has a right to index. Crucially, Stayart makes no complaint about Google's use of her name that pre-dates her battle with Yahoo! Google's search results are simply a reflection of the public's interest in Stayart, now largely driven by Stayart's own litigation activities.

Wisconsin's right of publicity law does not prohibit all public uses of a person's name or likeness, but only those uses that are "for advertising purposes or for purposes of trade."

1

Stayart's complaint fails as a matter of law because none of Google's search engine functions use Stayart's name "for advertising purposes or for purposes of trade" as that phrase has been interpreted. Indeed, the interpretation of "for advertising purposes or for purposes of trade" implicit in Stayart's complaint is so unreasonably broad that it would run afoul of the First Amendment and cripple the operation of Internet search engines. Wisconsin's right of publicity law does not require the result Stayart seeks, and the First Amendment does not permit it. Accordingly, Google's motion should be granted and Stayart's complaint dismissed in its entirety.

## STATEMENT OF FACTS

For the purposes of Google's motion to dismiss, the Court may consider the following background facts which are drawn from the factual allegations of the Complaint, the exhibits attached to the Complaint, and facts of which the Court may properly take judicial notice.[1] Further material facts will be introduced as needed in the argument section of this brief.

**Beverly Stayart and her litigation against Yahoo!** Beverly Stayart has willingly cultivated the status of a public figure. She alleges that she is a leader in the animal rights movement and is a scholar of genealogy, especially of the Siouan people, and that the Internet is the primary means of conducting these activities. Complaint ¶¶ 22-35. Her cultivated image is entirely "positive and wholesome," and it has no connection whatsoever with sexual matters.

---

[1] *See, e.g.,* Green v. Warden, U.S. Penitentiary, 699 F.2d 364 (7th Cir. 1983) (taking judicial notice of plaintiff's extensive record of litigation); *Menomonie Indian Tribe of Wisc. v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998) (holding that courts may properly consider judicially noticed documents without converting motion to dismiss to motion for summary judgment); *Williams v. Midwest Airlines, Inc.*, 321 F. Supp. 2d 993, 994 (E.D. Wis. 2004) (Adelman, J.) (taking judicial notice on motion to dismiss of background facts regarding the parties from various websites).

But Stayart is most widely known on the Internet as a litigant. In early 2009, she sued Yahoo! alleging that the results of search on its search engine for "bev stayart" violated her rights under the federal Lanham Act and Wisconsin's right of publicity. *See Stayart v. Yahoo! Inc.*, 651 F. Supp. 2d 873, 878-79 (E.D. Wis. 2009) (Randa, J., presiding) ("Stayart I"). Stayart complained that Yahoo!'s search results for "bev stayart" included sites related to Levitra and other erectile dysfunction medications, pornography, and on-line dating services. *Id.* at 879. This Court dismissed Stayart's Lanham Act claims on the merits, concluding that Stayart lacked standing because her name had no commercial value, that there was no likelihood of confusion, and her claims were barred by the federal Communications Decency Act, 47 U.S.C. § 230. *Id.* at 881-86. The Court expressed skepticism over Stayart's state law right of publicity claim, but it did not decide that issue and declined to retain jurisdiction over it. *Id.* at 888. Stayart's appeal of the dismissal of the Lanham Act claim has been fully briefed and argued at the Seventh Circuit. Early in 2010, Stayart revived her state law publicity claim in a second suit against Yahoo! in this Court. *Stayart v. Yahoo! Inc.*, No. 2:10-cv-00043-LA (E.D. Wis. filed Jan. 19, 2010) ("Stayart II").

Stayart's battle with Yahoo! has garnered significant public attention, especially among Internet commentators, who closely track technical and legal issues related to search engines. For example, Exhibit 3 to the Complaint is intended by Stayart to show that the search term "beverly stayart" has produced Internet traffic and is therefore valuable. But all of the search results shown on Exhibit 3 concern Stayart's suits against Yahoo! *See also* Complaint ¶¶ 109, 110, Ex. 14 (showing a Google search dated April 8, 2010, with results related to Stayart's Yahoo! litigation).

**Stayart's complaint against Google.** While litigating against Yahoo! in both the Seventh Circuit and in this Court, Stayart brought the instant action against Google. Stayart alleges that Google's search results violate her publicity rights under Wisconsin law by encouraging sellers of prescription drugs and other products to free-ride on her name and likeness. Stayart's lengthy complaint, at its core, alleges that her right of publicity is violated in three ways: (1) Google offers additional search queries when a user enters "bev stayart" as a search term, which include the query "bev stayart levitra"; (2) advertisements for Levitra are displayed when a user executes the search query "bev stayart levitra"; and (3) Google offers additional "related searches" when a user executes the search query "bev stayart levitra."

Google is the leading Internet search engine. Stayart characterizes Google as, in essence, an index to the Internet. Google searches available content and compiles a database which users may search at www.google.com. Complaint ¶ 7. A user can enter a few descriptive words into the Google.com interface, and Google will provide the user with links to the web pages that are relevant to the results. Complaint ¶ 8. As Stayart recognizes, the use of search engines greatly facilitates the use of the Internet. Complaint ¶ 9. Google's mission is, in its own words, "to organize the world's information and make it universally accessible and useful."[2]

Stayart's first core allegation is directed at one of Google's useful features called "Google Suggest." Google catalogues searches run by its users, so that when a user starts to type a search query, Google can offer additional search queries that are related to the terms the user is entering. *See* Complaint ¶¶ 10, 12, Ex. 7. Google Suggest is an automated tool, which operates without human intervention, and helps users create more focused searches. *Id.* The search queries are derived from searches run by other Internet users. Stayart's grievance is that when a

---

[2] *See* Exhibit A attached hereto, Google's corporate website at http://www.google.com/corporate/.

user enters "bev stayart" Google also offers a search for "bev stayart levitra." Complaint ¶¶ 10, 12.

Stayart's second core allegation is related to the primary means by which Google generates advertising revenue. Google is advertiser supported, just as are most general circulation newspapers and magazines. Complaint ¶ 64. Google displays ads, known as "sponsored links" that might be relevant to the user's query. An advertiser can bid on words, referred to as "keywords," to increase the chance that its sponsored link will appear in a column to the right, or in a separate section above, the ordinary, non-advertising results of a search query. *Id.* ¶ 64-66. Advertisers pay for each user who clicks on their "sponsored links" ads, at rates determined in an auction. *Id.* For example, if the user enters a search that includes the word "coffee," such as "how to brew coffee," a sponsored link for Folgers coffee might appear to the right of or above the search results. *Id.* at ¶¶ 16-21. If the user is interested in Folgers and clicks on the sponsored link, Folgers would pay Google. Stayart complains in this case that a search for "bev stayart levitra" will trigger the display of a sponsored link for Levitra, which she contends is tantamount to Google using "Bev Stayart" as a billboard to sell Levitra. This theory, of course, is based on the farfetched notion that a retailer of Levitra is bidding in the ad auction for *plaintiff's name* in order to advertise and sell Levitra.

Stayart's third core allegation concerns Google's display of "related searches." Along with the search results, Google will often display a list of search queries related to the one executed by the user. For example, along with the results for a search for "how to brew coffee," Google would list "Related searches for how to brew coffee." Those related searches would include queries such as "how to brew coffee in a coffee maker" and "how to grind coffee." Clicking on one of the related searches executes that query. Here, Stayart complains that on the

results page for the query "bev stayart levitra," Google displays related searches for "bev stayart" and other items related to Levitra.

## ARGUMENT

Wisconsin's right of publicity law prohibits exploitation of the commercial value of a person's name or likeness without consent. But this law is not intended to inhibit the informational use of the names of persons involved in matters of public interest. Google uses Stayart's name informationally in the course of indexing content available on the Internet. Her own litigation activities have created public interest in her dispute with Yahoo! and her association, or lack thereof, with Levitra. Google has a right to catalog this material, and doing so does not violate Stayart's right of publicity. The legal analysis of Stayart's Complaint under the standards governing this motion to dismiss can be distilled into two substantive questions:

    (1)    Has Google used Stayart's name "for purposes of advertising or purposes of trade" as that concept is used in Wisconsin's right of publicity law?

    (2)    Would the right of publicity, as alleged by Stayart, pass muster under the First Amendment?

Stayart's Complaint, when examined under both questions, fails to state a claim for relief and should be dismissed in its entirety.

## I.    The Complaint should be dismissed under Rule 12(B)(6) because Stayart has not stated a claim that is plausible on its face.

A motion to dismiss for failure to state a claim under Rule 12(b)(6) tests the legal sufficiency of the complaint. *Edgenet, Inc. v. Home Depot U.S.A., Inc*., No. 09-cv-747, 2010 WL 148389 (E.D. Wis. Jan. 12, 2010) (citing *Szabo v. Bridgeport Machs., Inc*., 249 F.3d 672, 675-76 (7th Cir. 2001) (Ex. B attached hereto). A complaint is legally sufficient only if it pleads facts that "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). After *Bell Atlantic* and

*Iqbal*, it is no longer enough for the plaintiff's claim to be *possible*, as under the previous *Conley* standard. *See Conley v. Gibson*, 355 U.S. 41, 47 (1957). Now to survive a motion to dismiss, the plaintiff's claim must be *facially plausible*.

*Iqbal* and *Twombly* set out a two-stage process for evaluating a complaint facing a motion to dismiss, a process directly applicable to this case. First, the Court must filter out allegations that are merely "[t]hreadbare recitals of the elements," or "legal conclusion couched as a factual allegation," none of which are presumed to be truthful. *Iqbal*, 129 S. Ct. at 1949-50. Many of Stayart's allegations are of this type. For example, Stayart repeatedly alleges that "Google has used Stayart's name for purposes of advertising or purposes of trade." *See, e.g.*, Complaint ¶¶ 86, 118-120, 123-124, 134. This allegation is merely a recital of an element of Stayart's claim for a violation of the right of publicity; the Court need not accept it as true, and Stayart must properly plead substantive facts to satisfy this element. To take another example, Stayart alleges that "Google has used Beverly Stayart's name as a billboard to sell Levitra." *See* Complaint ¶¶ 17, 20. The allegations invoking the billboard metaphor are merely legal conclusions masquerading as facts; the Court also need not accept these as true.

In the second analytical stage, the Court must evaluate the plausibility of Stayart's allegations. Stayart cannot survive a motion to dismiss by showing that her allegations are merely conceivable or possible. As the *Iqbal* Court put it, the plaintiff must plead facts that push the claim from the merely possible to the plausible. *Iqbal,* 129 S. Ct. at 1949. Many of Stayart's allegations simply cannot make this transition. For example, Stayart's allegation that Google uses her name as a billboard to sell Levitra is utterly implausible, given her detailed allegations showing that her image is entirely wholesome and has nothing to do with sexual matters. How, and why, would the name of a genealogist and animal rights activist serve as a billboard to sell

7

Levitra?  The more plausible explanation, of course, is that *any* search query including "levitra" will yield some results concerning Levitra and sexual matters, regardless of the other terms included in the query.  Section II.C.2 below demonstrates in detail the implausibility of Stayart's allegations concerning Google's keyword advertising.

At the end of the two-stage analysis, the well pled, facially plausible allegations in Stayart's complaint fail to state a claim for which relief can be granted, and thus the complaint must be dismissed.

## II.    Stayart's right of publicity claim fails because Google has not used Stayart's name "for advertising purposes or for purposes of trade."

The first substantive issue before the Court is a question of statutory interpretation: has Google used Stayart's name "for purposes of advertising or purposes of trade" as that concept is used in Wisconsin's right of publicity law?

### A.    Wisconsin's right of publicity, under both the statute and common law, applies only to use "for advertising or for purposes of trade."

Stayart has pled claims for violation of her right of publicity under both statutory and common law, but there is no substantive difference between the two claims.  Wisconsin's statutory right of publicity is a subsection of the statute codifying the tort for violation of the right of privacy, Wis. Stat. § 995.50 (enacted in 1977 as Laws of 1977, Ch. 176).[3]  The subsection concerning the right of publicity prohibits:

> The use, ***for advertising purposes or for purposes of trade***, of the name, portrait or picture of any living person, without having first obtained the written consent of the person or, if the person is a minor, of his or her parent or guardian.

[3] Wisconsin's right of publicity statute was modeled on the New York Statute.  *See* 1 J. Thomas McCarthy, *The Rights of Publicity and Privacy* § 6:131 (2d ed. 2010); Judith Endejan, *The Tort of Misappropriation of Name or Likeness Under Wisconsin's New Privacy Law*, 1978 Wis. L. Rev. 1029 (1978) (containing an extensive review of the legislative history which led to the enactment of the 1977 statute).

Wis. Stat. § 995.50(2)(b) (emphasis added) (2007-08). The Wisconsin Supreme Court has held that the right of publicity has also been recognized under the common law of the state. *Hirsch v. S.C. Johnson & Son, Inc*., 90 Wis. 2d 379, 280 N.W.2d 129 (1979). *Hirsch* concerned a violation of Hirsch's right of publicity that occurred before the statute was enacted in 1977, and thus it is not clear from *Hirsch* whether the statute has superseded the common law claim.

However, the question is essentially academic, as at least one unpublished Court of Appeals case holds that the elements of the statutory and common law claims are identical. *Hannigan v. Liberty Mutual Ins. Co*., 230 Wis. 2d 746, 604 N.W.2d 33 (Table), 1999 WL 667303, at *10 (Wis. Ct. App. Aug. 26, 1999) (concluding that the "essence of the statutory claim and the common law claim discussed in *Hirsch* is the same" and using the same analysis and elements for both) (Ex. C attached hereto). Moreover, the statute itself is tied to the common law because it provides that "[t]he right of privacy recognized in this section shall be interpreted in accordance with the developing common law of privacy, . . . with due regard for maintaining freedom of communication, privately and through the public media." Wis. Stat. § 995.50(3). Thus, Stayart's statutory and common law claims stand or fall together, and both require Stayart to plead and ultimately prove that the use of her name is "for advertising purposes or for purposes of trade."

**B.** **The phrase "*for advertising purposes or for purposes of trade*" is narrowly construed to mean direct commercial exploitation.**

Statutory interpretation begins with the plain language of the statute, but the phrase "for purposes of advertising or purposes of trade" is simply not plain on its face. Accordingly, this Court must determine legislative intent in the full context of the statute in a manner that serves the legislative purpose. *Deputy v. Lehman Bros.,* 374 F. Supp. 2d 695, 707 (E.D. Wis. 2005) (citing *State v. Reed*, 695 N.W.2d 315, 319 (Wis. 2005)). The Court must be particularly

mindful here of the express legislative mandate to preserve the "freedom of communication." For example, although an advertising-supported newspaper is clearly an item of trade, the statute cannot be read so broadly as to prevent the use of a person's name in normal public discourse, including matters of legitimate public interest.

> 1. **Wisconsin courts have limited the right of publicity to claims involving direct commercial exploitation.**

Guidance from Wisconsin courts is sparse, but the handful of Wisconsin cases concerning the right of publicity show that the statute does not apply broadly to communication on matters of legitimate public interest, but narrowly to the direct commercial exploitation of a person's name or likeness. The leading Wisconsin case on the right of publicity is *Hirsch*. There, Elroy Hirsch claimed that his right of publicity was violated by S.C. Johnson's sale and promotion of a women's shaving gel under the name "Crazylegs," which was the nickname by which Hirsch was widely known. 90 Wis. 2d at 386-99. Hirsch could not rely on the Wisconsin right of publicity statute because it had not yet been enacted when S.C. Johnson began use of the Crazylegs name. Indeed, Hirsch's case was, in part, the impetus for the statute's enactment. The *Hirsch* court held that Hirsch had a right of publicity under the common law of Wisconsin that pre-dated the statute, and that the sale of the Crazylegs product violated it. Although the Court was not directly called upon to interpret the phrase "for purposes of advertising or purposes of trade," the Court's discussion of the right of publicity shows that only direct commercial exploitation violates it. *Hirsch*, 90 Wis. 2d at 391. According to the *Hirsch* court, the right of publicity consists of "the right to control the commercial exploitation of aspects of a person's identity." *Id.*

The few other Wisconsin cases dealing with the right of publicity do not directly define "for purposes of advertising or purposes of trade," but they all suggest that it includes only direct

commercial exploitation. For example, in *Ladd v. Uecker*, the plaintiff was a baseball fan who

had been enjoined from harassing Bob Uecker, the Brewers' radio announcer. 2010 WI App 28,

780 N.W. 2d 216. More than a year after the injunction issued, the plaintiff sued Uecker and the

Brewers for defamation and invasion of her privacy, for, among other things, photographing her

in the stands at baseball games and disseminating her mug shot and information about an

incident in which she was evicted from a Brewers' game. In affirming the dismissal for failure

to state a claim (primarily on statue of limitations and immunity grounds) the Court of Appeals

also concluded that none of the plaintiff's allegations constituted using her name or likeness for

advertising or trade.

Likewise, the Court of Appeals affirmed the dismissal of a right of publicity claim in an

unpublished decision in *Hannigan*. In *Hannigan*, the plaintiff brought a right of publicity claim

against two attorneys he alleged had wrongly acquired certain of his medical records and

disclosed them to an insurance company without his consent. The plaintiff contended that this

disclosure was "for purposes of trade," because it was made in the course of the attorneys'

professional work. The Court of Appeals disagreed and declined to define "for purposes of

trade" as any use in a profession. Accordingly, the court of appeals upheld the dismissal of the

right of publicity claim on summary judgment. 1999 WL 667303, at *10 (concluding that the

complaint stated no claim under the right of publicity statute).

In sum, Wisconsin courts have not interpreted "for purposes of advertising or purposes of

trade" broadly to include any public disclosure motivated by some commercial motive. Instead,

Wisconsin courts have limited right of publicity claims to those involving direct commercial exploitation, such as the sale of the Crazylegs shaving gel.[4]

2. **The right of publicity does not prohibit the use of a person's name or likeness in connection with communications on matters of legitimate public interest, even if those communications are commercially motivated.**

It is axiomatic that not every commercial use of a person's name or likeness is actionable under the right of publicity. To illustrate the scope of the tort, and what uses are actionable, it is useful to consider the categories of uses of individuals' names, portraits, and likenesses that courts have addressed in cases involving the right of publicity. Such uses can be categorized as follows: (1) direct advertising use; (2) commercial exploitation on a product; (3) expressive use; or (4) informational use.

The first category of uses are typically actionable under this tort, namely uses of a person's name or likeness in advertising a product to which the person is not related. A classic example of this type of case involves celebrity look-alikes used to promote products without the celebrity's authorization. *See, e.g., Onassis v. Christian Dior-New York, Inc.*, 472 N.Y.S.2d 254, 263 (N.Y. Sup. Ct. 1984), aff'd, 110 A.D.2d 1095 (App. Div. 1985) (enjoining further publication of Christian Dior clothing advertisement featuring photograph of look-alike of Jacqueline Kennedy Onassis, and explaining that "plaintiff's identity was impermissibly misappropriated for the purposes of trade and advertising").

---

[4] To cite another recent example involving direct commercial exploitation, the Western District of Wisconsin held that the plaintiff had stated a claim for a violation of her right of publicity by alleging that her name and photo had been used without her permission for an advertisement for a festival in which she did not participate. *Conrad v. Madison Festivals, Inc.*, No. 09-cv-499-bbc, 2009 WL 3018031 (W.D. Wis. Sept. 15, 2009). This case, however, is of limited import because the court made this determination in the context of the court's ex parte review of the plaintiff's petition to proceed in forma pauperis, and thus the issue was not contested.

The second category includes situations where a person's name or likeness is not used merely for advertising purposes, but is directly exploited in connection with a commercial product. *Hirsch* provides a good example, where a famous athlete's well known nickname, "Crazylegs," was used by the defendant as the brand name of a shaving gel. In *Doe v. TCI Cablevision*, 110 S.W.3d 363, 370, (Mo. 2003), *aff'd* sub nom. *Doe v. McFarlane*, 207 S.W.3d 52 (Mo. Ct. App. 2006), the defendant violated the right of publicity of a professional hockey player using hockey player's identity as the villain in a comic book. These examples illustrate uses "for purposes of trade," as distinct from for purposes of advertising. The person's name or likeness is incorporated into the product so that the commercial value of the person's identity can draw trade to the product.

The third and fourth categories, namely expressive uses and informational uses, fall outside the scope of the right of publicity. The third category comprises expressive uses in which the defendant's product is an expressive work, such as work of art or a motion picture. If the use of the plaintiff's identity has genuine relevance to the work, the use will be deemed to be an expressive use outside the scope of the right of publicity. *See, e.g.*, *Rogers v. Grimaldi*, 875 F.2d 994, 1001-04 (2d Cir. 1989) (names Ginger and Fred used in film were not "chosen just to exploit the publicity value of their real life counterparts but instead have genuine relevance to the film's story"); *Donahue v. Warner Bros. Pictures Distributing Corp*., 2 Utah 2d 256, 272 P.2d 177 (Utah 1954) (the right of publicity was only intended to apply to actual advertising or the promotion of sales of a collateral commodity, and holding that the semi-fictional portrayal in a movie of a person's life was not "for purposes of trade").

The fourth category of use is also outside the scope of the right of publicity, and it includes uses of a person's name or likeness that are purely informational. For example, use of a

person's name or photo in a newspaper article relating to a matter of public interest do not violate a person's right of publicity or privacy. *See, e.g., Ladd,* 780 N.W.2d 216 (use of photos of the subject of lawsuit for news was not actionable under right of publicity); *Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400, 416-17, 114 Cal. Rptr. 2d 307 (Cal. App. 2001) (baseball league's use of former players' names and likenesses in websites, documentaries and game day programs did not support right of publicity claim); *Kline v. Robert M. McBride & Co.,* 170 Misc. 974, 11 N.Y.S.2d 674 (New York 1939) (summarizing cases and holding that New York publicity statute does not apply to use of names and likenesses in historical or newsworthy publications).

Thus, the right of publicity is not implicated in situations where—as here—names or likenesses are used in informational ways, and not for purposes of advertising or for purposes of trade. Google's use of "bev stayart" can be properly characterized as an entirely informational use, because Google is using her name to index the Internet and present search results to Internet users.

> **3.** **Precedent from other jurisdictions illustrates how the meaning of "for advertising or for purposes of trade" limits right of publicity claims to those involving direct commercial exploitation.**

In accord with cases decided under Wisconsin's right of publicity law, informative precedent in other jurisdictions also supports the interpretation of the right of publicity to cover only instances involving direct commercial appropriation of a person's name or likeness. Wisconsin's right of publicity law, Wis. Stat. § 995.50(2)(b), was modeled on the New York statute, which was used as a model for many states' right of publicity laws. Under Wisconsin canons of statutory interpretation, statutes that have received judicial construction in another state and then have been adopted by Wisconsin are taken with the construction that has been given to them. *See Carlson Heating, Inc. v. Onchuck*, 104 Wis. 2d 175, 311 N.W.2d 673 (Ct.

14

App. 1981); *see also 2 B Norman J. Singer, Statutes and Statutory Construction* § 52:2 (7th ed. 2007).

The legislative history of Wisconsin's right of publicity law confirms that the legislature was indeed aware of some of these constructions, which limit the right of publicity to direct commercial exploitation. *See* Exhibit D, attached hereto, Legislative Council Memorandum, "*Important Cases and Events in the Development of the Law of Privac*y," citing *Moser v. Press Pub. Co*., 109 N.Y.S. 963 (N.Y. Sup. Ct. 1908) (dismissing complaint and ruling that the sale of a newspaper or magazine did not constitute a "trade purpose" within the meaning of the statute); *Gautier v. Pro-Football, Inc*., 99 N.Y.S. 2d 812 (N.Y. City Ct. 1950); *rev'd* 106 N.Y.S.2d 553 (N.Y. App. Div. 1951), *aff'd,* 304 N.Y. 354 (1952) (ruling that despite the fact that television programs are sponsored, the use of a name or a picture in a truthful report on a television program did not constitute a trade purpose).

Courts in other jurisdictions construing "for advertising purposes or purposes of trade" have generally interpreted the phrase to include only direct commercial exploitation of a person's name or likeness.  Only uses of a person's name or likeness that are in the first two categories described above—direct advertising or commercial exploitation on a product—fall within the meaning of the phrase "for advertising purposes of purposes of trade."  Courts interpreting the New York statute have held that a person's name is used "'for advertising purposes' if it 'appears in a publication which, taken in its entirety, was distributed for use in, or as part of, an advertisement or solicitation for patronage of a particular product or service.'"  *School of Visual Arts v. Kuprewicz*, 771 N.Y.S.2d 804, 812 (N.Y. Sup. Ct. 2003) (citing *Beverley v. Choices Women's Med. Ctr*., 78 N.Y. 2d 745, 751 (1991)).  Similarly, use for "trade purposes" involves use which would draw trade to the defendant when the use is predominantly commercial rather

than expressive or informative. *Id.*; *compare Simeonov v. Tiegs*, 602 N.Y.S.2d 1014, 1017-18 (N.Y. City Ct. 1993) ("Just because [the artist] incidentally intended to sell a number of copies of his creation [a sculpture based on the face of model Cheryl Tiegs], that does not mean that he was acting 'for purposes of trade.'"), *to Young v. Grenker Studios, Inc.,* 26 N.Y.S.2d 357 (N.Y. Sup. Ct. 1941) (allowing right of publicity claim to proceed where plaintiff manufactured and sold of large number of commercial mannequins rendered in the likeness of the plaintiff). The phrase "for purposes of trade" includes violations of individuals' publicity rights that are not purely in advertising, for example, the use of the nickname "Crazylegs," on a shave gel product; but it does not include predominantly expressive uses. *See Hirsch*, 90 Wis. 2d 379.

These same limitations on the scope of the right of publicity have been applied to the Internet as well as traditional media. *See Kuprewicz*, 771 N.Y.S.2d 804 (finding that false job postings on Craigslist did not fall within scope of advertising or trade purposes); *Leary v. Punzi*, 687 N.Y.S.2d 551, 551 (N.Y. Sup. Ct. 1999) (holding that website listing of a dance center's former employee as the contact person for the center was not "for advertising purposes" because plaintiff's name "was not used in a manner directly related to the product or service.").

Commercial sponsorship, advertiser support, or an intent to profit does not itself render the use at issue "for advertising purposes of purposes of trade." *See Leidholdt v. L.F.P., Inc.*, 860 F.2d 890, 895 (9th Cir. 1988) ("The fact that Hustler Magazine is operated for profit does not extend a commercial purpose to every article within it."); *see also Gautier*, 304 N.Y. 354 at 358 ("Although the telecast was paid for by defendant Liggett & Myers Tobacco Co., the entire program was not thereby constituted a solicitation for patronage . . . the mere fact of sponsorship of the telecast would not, in our opinion, suffice to violate the statute").

16

**C.     Google's use of Stayart's name is not for direct commercial exploitation, but to facilitate communication on matters of legitimate public interest.**

Google's use of Stayart's name or likeness is used in connection with the discussion of matters of public interest. Stayart's name is not used as a device to draw trade to Google; Stayart is legitimately a component of the information Google indexes and coveys to the public. When the use of a person's name is primarily informational, it is not for purposes of advertising or purposes of trade, even if the information is also commercially valuable. *See, e.g., Rand v. Hearst Corp.*, 298 N.Y.S.2d 405, 409 (N.Y. App. Div. 1969), aff'd, 257 N.E.2d 895 (N.Y. 1970) (the "words 'advertising purposes' and for the 'purposes of trade'. . . must be construed narrowly and not used to curtail the right of free speech, or free press, or to shut off the publication of matters newsworthy or of public interest, or to prevent comment on matters in which the public has an interest or the right to be informed."). Accordingly, Google's use of Stayart's name or likeness falls outside the scope of the right of publicity.

**1.     The Google Suggest feature does not use Stayart's name for advertising or trade purposes.**

Stayart contends that one of the ways that Google allegedly violates her right of publicity is by using her name as a search term. Stayart alleges that:

> After a searcher types 'bev stayart' into the search box on the Google Tool bar [or on www.google.com], the suggested search term 'bev stayart levitra' immediately appears in the drop down menu beneath 'bev stayart,' even before the searcher can press the 'enter' key for 'bev stayart.'

Complaint ¶¶ 10-12.  The Google feature that Stayart describes here is Google Suggest, one of the features of the search engine designed to enhance Internet users' ability to obtain useful information faster.  *See* Complaint, ¶¶ 77, 94-95, Ex. 7.[5]

As a person types a search into the search engine, Google Suggest proposes possible search queries based on other users' previous search activities.  Complaint, ¶ 77, Ex. 7 (explaining that "search queries in the Google Suggest drop down menu are an objective reflection of query terms that are popular with our users and on the Internet . . . [Google uses] algorithms to detect patterns based on data sources including user search inquiries").  Queries from Google Suggest simply reflect the interests of other Google users, which are then used to facilitate fast and accurate searching.

The suggested search "bev stayart levitra" simply reflects the interests of Google users, who are interested in Internet material dealing with "bev stayart" and "levitra."  This interest is entirely legitimate, and it is driven by Stayart's litigation activities.  Indeed this use is "informational" like the use at issue in *Ladd v. Uecker*, 780 N.W.2d 216.  Google's offering of the search query "bev stayart levitra" does not constitute a use "for purposes of advertising or purposes of trade."

### 2. Google does not use Stayart's name or likeness for advertising or trade purposes for keywords or for its Sponsored Links.

Stayart's allegations also relate to Google's Sponsored Links.  She claims that Google's Sponsored Links feature makes the following uses of her name:

> First, Google uses the keywords or keyword phrases selected by advertisers to trigger the sponsored link advertisement.

---

[5] *See also* Exhibit E, attached hereto, Google's explanation of the function of the Google Suggest feature: http://www.google.com/support/websearch/bin/answer.py?hl=en&answer=106230.

Second, Google suggests additional keywords or keyword phrases to advertisers that the advertiser had *not* previously chosen.

Third, Google selects its own keywords or keyword phrases to trigger the sponsored link advertisements of its advertisers.

Complaint ¶ 73. Stayart also alleges that Google provides the physical venue, like a billboard, for "bev stayart levitra" on which sponsored links advertisements for erectile dysfunction drugs are placed. Complaint ¶¶ 16-21; *see* Complaint ¶ 17 ("'Bev Stayart levitra' is an Internet billboard on which Google is selling ad space').[6]

Stayart's allegations concerning keywords are not facially plausible and cannot state a claim under *Iqbal*, which requires that a plaintiff establish a plausible claim for relief. 129 S. Ct. at 1949. It is difficult to imagine that any advertiser of erectile dysfunction drugs would purchase "bev stayart" as a keyword. Stayart pleads in detail that her public image is entirely wholesome and has nothing whatsoever to do with sexual matters. *See* Complaint ¶¶ 22-35; *see also Stayart II*, No. 2:10-cv-00043, Complaint ¶¶ 18, 23 (Dkt. No. 1) (alleging that Stayart's image is "positive and wholesome, and that "Stayart has never engaged in a promiscuous lifestyle or other over sexual activities."). Stayart's wholesome image could have no value as a billboard for erectile dysfunction drugs because it could not possibly induce anyone to purchase

---

[6] Stayart also alleges that consumers are misled by Google's selling of the keyword phrase "bev stayart levitra" into thinking that Stayart endorses Levitra. Complaint ¶ 21. This allegation is merely derivative of Stayart's core keyword allegation, and it fails to state a claim for the same reasons the keyword allegations fail. But her false endorsement allegation fails for additional reasons. First, it is immaterial, because falsity, confusion or deception are not elements of Stayart's right of publicity claim. Second, the bare assertion that Google is misleading consumers is merely conclusory and need not be credited as true on a motion to dismiss. Third, Google's sale of keywords cannot mislead consumers, as consumers are not aware whether a keyword has prompted the display of a sponsored link. Fourth, the placement of sponsored links does not create any false endorsement: even if the Internet user cannot tell the difference between a sponsored link and an ordinary search result, Stayart's name does not appear in any sponsored link. No false endorsement is suggested by placing multiple search results and sponsored links on the same page. In particular, no Internet user could reasonably infer that Stayart endorses Levitra merely because a search result including Stayart's likeness appears on the same results page as a sponsored link for Levitra.

19

them.  There is a highly plausible alternative explanation for the search results: the inclusion of the term "levitra" in a search query will produce sponsored links for Levitra and other sexually oriented material almost regardless of what other terms are included in the query.

Stayart's Sponsored Link allegations are similar to the allegations dismissed in *Iqbal*.  In *Iqbal*, the plaintiff pled that the defendants, Department of Justice officials, subjected him to harsh and restrictive conditions "as a matter policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest."  129 S. Ct. at 1959.  The plaintiff further alleged that the FBI's arrest and restrictive detention of Arab Muslims after September 11, 2001, was specifically approved by the defendants. The Supreme Court acknowledged that the plaintiff's factual allegations were indeed consistent with the plaintiff's allegation that Department of Justice officials had purposefully unlawful discriminated against him on the basis or religion or national origin.  But the Court reasoned that despite these allegations, the detention of Arab Muslims was more plausibly explained as response to the September 11, 2001 terror attacks.  *Id*. at 1951.  Accordingly, the Court concluded that "[a]s between that 'obvious alternative explanation' for the arrests, and the purposeful, invidious discrimination [plaintiff] asks us to infer, discrimination is not a plausible conclusion."  *Id*. at 1949.  In light of the more plausible explanation, the plaintiff's implausible allegations were not enough to survive a motion to dismiss.  *Id*.

Stayart's allegations regarding Google's alleged sale of "bev stayart levitra" as a keyword are likewise "naked assertions devoid of factual enhancement," subject to more "obvious alternative explanation."  Stayart has become a matter of public interest and the Internet content concerning her also concerns "Levitra."  *See* Complaint Exs. 13-30 (showing that the majority of search results concerning Stayart related to her litigation with Google and Yahoo!).  A

20

Sponsored Link for Levitra appears when a user makes a query for "bev stayart levitra" because "levitra" is a keyword purchased and used in connection with advertising Levitra. *See* Complaint ¶ 91. Even if Stayart's allegations are minimally consistent with the remote possibility that Google is trying to use Stayart's name to sell Levitra and other sexual products, given their internal inconsistency and implausibility, her allegations do not state a viable claim. The Complaint simply does not show "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal* at 1951.

Even if "bev stayart levitra" were purchased as a keyword on Google, that would still constitute an informational use of "bev stayart," one not prohibited by Wisconsin's right of publicity law. Plaintiff's name would not be of much use in selling Levitra, but would be important to users interested in news reporting about Stayart's litigation, or finding copies of her complaints. A media organization, court information service, or a blogger or other commentator might wish to offer advertising to users who conduct a search involving plaintiff's name, or even her name in conjunction with "levitra," without violating plaintiff's right of publicity.

Indeed, it is impossible to distinguish search-prompted advertising on a Google search results page from advertising that might appear on a web page that a user reaches after searching a publisher's website for a particular person's name. For example, users might search for "Brad Pitt" on the People magazine website (http://www.people.com/people/), and get articles and other information about Pitt along with advertising that might even reference the actor by name. That simple search, notwithstanding the resulting advertising, does not make the query or People magazine's response "for purposes of advertising or purposes of trade."

In sum, the existence of keyword advertising on the results page for the query "bev stayart levitra" is an informational use, not a prohibited use "for purposes of advertising or

purposes of trade." Those search results, including the sponsored links, are a matter of legitimate public interest, and Google does not violate Stayart's right by providing them. Stayart's allegations concerning Google's keywords do not constitute a facially plausible claim for relief, and they should be dismissed.

### 3. Google does not use Stayart's name or likeness for advertising or trade purposes in its "Related Searches."

Stayart also complains about "related searches" provided by Google after a search query is executed. Stayart contends that her name has been used to generate thousands of sponsored links:

> On April 18, 2010, Plaintiff documented 1,970 "sponsored links" by first typing "bev stayart" in the search box on www.google.com; then clicking "bev stayart levitra" in the drop down menu and searching for "sponsored links"; next clicking the link "Show options" at the top of the page; and then clicking the option "Related searches" on the left-hand-side of the page. She found the following fifteen "related searches for "bev stayart levitra":

| | | |
|---|---|---|
| bev stayart | bev stayart **how long does** levitra **last** | greg stayart |
| bev stayart **cialis** | bev stayart levitra **sues** | bev stayart **lyrica** |
| bev stayart **viagra** | bev stayart levitra **automatically** | bev stayart **livitra** |
| bev stayart **lavitra** | bev stayart levitra **ago** | bev stayart **enzyte** |
| bev stayart **ed** | bev stayart levitra **search** | bev stayart levitra **news** |

Complaint ¶ 111 (also explaining how Stayart clicked on almost all of these links to compile 1,970 sponsored links); *see also* ¶¶ 94-106; 111-112.

The way in which Stayart discovered—or more accurately created—these results, shows that this allegation cannot state a facially plausible claim for relief. Stayart began by executing a search for "bev stayart levitra." The results included a number of related searches, which Stayart then executed by clicking on links provided. Each of these suggested searches produced further results, and additional sponsored links, and further related searches. By continuing this process using related searches, Stayart was able to find thousands of sponsored links, each of which she

contends violate her right of publicity. *See* Complaint ¶¶ 94-95 (alleging that clicking on queries related to "bev stayart levitra" leads to "multitudinous results" and almost 2,000 sponsored links).

Nearly any person on earth could trump up a similar allegation simply by beginning with a search combining his name with that of a commercial product. For example, "john smith titleist" would likely turn up sponsored links for golf balls and related searches for golf and sporting equipment. John Smith could follow these related searches and undoubtedly compile a list of thousands of sponsored links. But none of these links would really use "John Smith" as a billboard to sell golf equipment, and none of any of this would constitute the use of John Smith's name "for purposes of advertising or purposes of trade." Likewise, Stayart started with a search query including for her own name and that of a commercial product. The fact that this search query produced results, sponsored links, and further suggested searches all related to that commercial product cannot state a claim for relief against Google.

## III. Stayart's interpretation of Wisconsin's right of publicity would violate the First Amendment.

The second substantive issue before the Court is a Constitutional question: would the right of publicity, as alleged by Stayart, pass muster under the First Amendment?

### A. The First Amendment limits the right of publicity.

The interpretation of the right of publicity implicit in Stayart's complaint is so unreasonably broad that it would run afoul of the First Amendment. It is well established that the right of publicity is sharply limited by the First Amendment. *See, e.g., Zacchini v. Scripps-Howard Broadcasting Co*., 433 U.S. 562, 575-76 (1977) (holding that the First Amendment limits the scope of the right of publicity; concluding that the First Amendment protected a broadcaster's right to report and comment on a performer's act, but not to broadcast the entire

performance).  Properly interpreted, the limitation that a use must be "for advertising purposes or for purposes of trade" prevents the right of publicity from impermissibly encroaching on the First Amendment.  Even if a particular use of a person's name or likeness falls within the literal terms of the statute, that use may still be protected by the First Amendment.  *See, e.g., Stern v. Delphi Internet Services Corp.*, 626 N.Y.S.2d 694 (N.Y. Sup. Ct. 1995).

Decisions from many courts demonstrate that the use of a person's name or likeness in the course of reporting or commenting on matters of public interest are protected by the First Amendment, even when those uses are highly commercialized.  For example, in *ETW Corp. v. Jireh Publ'g, Inc.*, an artist depicted Tiger Wood's victory in the 2000 U.S. Open golf tournament in a painting which he reproduced and sold in a limited, but still sizeable, edition at a substantial profit.  332 F.3d 915, 918 (6th Cir. 2003).  Woods objected on the grounds that the reproduction was a commercial product, the sale of which violated his right of publicity.  The court rejected Woods' claim on the grounds that the First Amendment protected the artist's work as a form of commentary on a matter of public interest, despite its plainly commercial motive.  *Id.* at 932-39.

An even more commercial use was held to be protected by the First Amendment in an influential California decision in *Montana v. San Jose Mercury News, Inc*., 40 Cal. Rptr. 2d 639 (Ct. App. 1995).  In that case, a newspaper created a promotional poster commemorating the San Francisco 49ers' five Super Bowl victories, prominently featuring a photograph of quarterback Joe Montana.  40 Cal Rptr.2d at 640.  The poster was separate from the newspaper, but distributed with it.  *Id.*  Montana objected on right of publicity grounds, but the court held that the newspaper was entitled under the First Amendment to promote its own sports coverage by means of the poster.  *Id.* at 797.

24

Google is aware of no case in which the use of a person's name as a search term or a keyword has been held to be a violation of the right of publicity. The closest analogous case is *Stern,* 626 N.Y.S.2d 694. The defendant, Delphi, was an online service provider of a bulletin board system which allowed subscribers, for a fee, to read and post messages on topics of interest. One popular topic on the Delphi service was radio personality Howard Stern's recently announced candidacy for governor of New York. Delphi used Stern's name and photograph without his permission in an advertisement for the Delphi bulletin board, which Stern challenged as a violation of his right of publicity. 626 N.Y.S.2d at 695. The court held that the use of Stern's name and picture to advertise the electronic bulletin board was exempt from liability under the First Amendment. *Id*. at 697-700.

The court reasoned that Delphi's on-line information service was "analogous to that of a news vendor or bookstore, or a letters-to-the-editor column of a newspaper, which require purchase of their materials for the public to actually gain access to the information carried." *Id.* at 697. Further, the court held that "a computerized database is the functional equivalent of a more traditional news vendor, and the inconsistent application of a lower standard of liability to an electronic news distributor . . . than that which is applied to a public library, book store, or newsstand would impose an undue burden on the free flow of information." *Id.* (citing *Cubby, Inc. v. CompuServe, Inc.*, 776 F. Supp. 135, 140 (S.D.N.Y. 1991)). Thus, the use was incidental to the promotion of a discussion of a matter of public interest, and it was therefore constitutionally protected.

Google's function and purpose is highly analogous to that of the online service provider in *Stern*, or a newspaper, book store or library card catalog, or any other third-party index. Like a news vendor, newspaper, or bookstore, Google is a for-profit enterprise, but it is also a

platform, like the Delphi service, where third parties can provide news, information, and commentary. Like in a newspaper, advertisers can place advertising adjacent to the news and commentary. As shown in the exhibits to Stayart's Complaint, the primary use (i.e., search engine hits) of her name or likeness is in connection with on-line articles, blog posts, and other material primarily devoted to coverage of Stayart's litigation against Yahoo!, all of which are First Amendment-protected content.

Unlike Delphi, Google does not make any direct commercial use of Stayart's name. Google does not use Stayart to advertise its own services. Google's use of Stayart's name as a search term or even as a keyword is merely incidental to Google's cataloging and indexing of material of legitimate public interest, and the provision of that service in conjunction with advertising by others does not strip Google of First Amendment protection. *See also* 2 J. Thomas McCarthy, *The Rights of Publicity and Privacy* § 8:69 (2d ed. 2010) (compiling cases and explaining incidental use exceptions); *Seale v. Gramercy Pictures*, 949 F. Supp. 331, 336 (E.D. Pa. 1996) (use of name and photo of former Black Panther Bobby Seale in historical docudrama film and book, and advertising for them, was not infringement of Seale's right of publicity).

**B.     Stayart's interpretation of the right of publicity would cripple the operation of Internet search engines and restrict access to information.**

If the right of publicity law were as broad as Stayart alleges it, the tort would greatly interfere with many previously recognized expressive and communicative activities, as discussed above. Stayart's view of the right of publicity would especially cripple the operation of Internet search engines. According to Stayart, Internet search engines ought not to use any person's name as a proposed search term, which would even prevent such innocuous activity as suggesting the proper spelling, or alternative spelling, of a person's name. Search engines might

even be prevented from allowing users to search for plainly newsworthy matters with searches such as "Mark McGuire steroids" or "Tiger Woods scandal."  Certainly, under Stayart's view, no advertising would be permitted on the results page for any such query.

Under Stayart's view, Google would also be prohibited from presenting Internet users looking for information regarding Bev Stayart's litigation with Yahoo! or Google from using the search terms "bev stayart levitra," "bev stayart Yahoo!," or "bev stayart Google."  These queries, like any news article or item, are matters of public interest.  Google is entitled to help Internet users find material relevant to these queries, and Google is entitled to realize revenue for doing so.

## CONCLUSION

Google's alleged uses of Stayart's name or likeness are outside of the scope of right of publicity law.  Google's use of Stayart's name is not "for advertising purposes or for purposes of trade" as that term is properly construed.  Furthermore, even if Google's use of Stayart's name fell within the literal scope of the right of publicity statute, the First Amendment would protect Google's right to use Stayart's name in connection with its catalog of Internet material concerning Stayart and her litigation activities.  In sum, Stayart fails to plead a facially plausible claim against Google, and her Complaint should be dismissed in its entirety.

Dated:  June 3, 2010                         Respectfully submitted,

                                             By:    s/*James D. Peterson*
                                                    James D. Peterson
                                                    Wisconsin State Bar No. 1022819
                                                    Jennifer L. Gregor
                                                    Wisconsin State Bar No. 1078174

                                                    GODFREY & KAHN, SC
                                                    One East Main Street
                                                    P.O. Box 2719
                                                    Madison, WI  53701-2719
                                                    Telephone: 608.257.3911
                                                    Facsimile:  608.257.0609
                                                    E-mail:          jpeterson@gklaw.com
                                                    Email:           jgregor@gklaw.com

                                                    *Attorneys for defendant Google Inc.*

4991940_10