# INTRODUCTION

In the American legal system, each party normally is responsible for his own legal fees and costs. *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983).

But in order to advance a variety of public policy goals, Congress, as well as most states, has enacted statutes that shift attorney fees to an opposing party.

For example, Section 1988 of the Civil Rights Attorney's Fees Awards Act of 1976 (42 U.S.C. § 1988, hereafter "Section 1988") states:

> In any action or proceeding to enforce a provision of [42 U.S.C.] sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

The purpose of Section 1988 is to provide the plaintiff with a "source of funds for retaining competent counsel" in a civil rights case. *Moore v. National Ass'n. of Secs. Dealers, Inc.*, 762 F. 2d 1093, 1099 n. 10 (D.C. Cir. 1985).

A defendant may not recover attorney fees under Section 1988 unless the district court finds that the action was "frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so." *Hughes v. Rowe*, 449 U.S. 412, 422 (1980).

Section 285 of the Patent Act (35 U.S.C. § 285, hereafter "Section 285") provides that a court in "exceptional cases" may award reasonable attorney fees to the prevailing party. This is "to provide discretion where it would be *grossly unjust* that the winner be left to bear the burden of his own counsel which prevailing litigants normally bear." *Badalamenti v. Dunham's, Inc.*, 896 F. 2d 1359, 1364 (Fed. Cir. 1990) (citations omitted; emphasis in original).

Wis. Stats. § 995.50(1)(c) provides that one whose privacy is unreasonably invaded is entitled to recover "[a] reasonable amount for attorney fees." This furthers the goal of pursuit of meritorious claims by reimbursing a plaintiff's legal fees.

1

In *Pachowitz v. Ledoux*, 2003 WL 21221823 (Wis. App., May 28, 2003), an emergency medical technician was found to have violated a patient's privacy, pursuant to Wis. Stats. § 895.50, by disclosing to a third party the reason that she needed medical attention. A jury awarded the plaintiff's estate $3,000, while the trial court awarded $30,460 in attorney fees. These amounts were upheld by the Wisconsin Appellate Court, District II. *See*, Exhibit 1.

In *Poston v. Burns*, 325 Wis. 2d 404, 784 N.W. 2d 717 (2010), the plaintiffs alleged their neighbors violated their privacy by tape-recording them, pursuant to Wis. Stats § 995.50(2)(a). A jury found in favor of the plaintiffs. Judgment was entered for $41,080.23, which represented $33,806.90 in attorneys' fees, and the remainder in costs.

The Wisconsin Appellate Court, District II, found no competent evidence of a violation of privacy. Judgment for the plaintiffs was vacated, with directions to the trial court to enter judgment for the defendants. *See*, Exhibit 2.

Wis. Stat. § 995.50(6) sanctions a plaintiff who brings a frivolous suit by shifting a defendant's attorney fees to the plaintiff. The law states:

(a)     If judgment is entered in favor of the defendant in an action for invasion of privacy, the court shall determine if the action was frivolous. If the court determines that the action was frivolous, it shall award the defendant reasonable fees and costs relating to the defense of the action.

(b)     In order to find an action for invasion of privacy to be frivolous under par. (a), the court must find either of the following:

1.     The action was commenced in bad faith or for harassment purposes.

2.     The action was devoid of arguable basis in law or equity.

Reading § 995.50(1)(c) and § 995.50(6) together, any plaintiff who successfully pursues an invasion of privacy suit is entitled to an award of a "reasonable" amount of attorney fees and

costs.  But a defendant who successfully defends a privacy suit will not automatically receive "reasonable" attorney fees or costs.

Only in those rare or exceptional cases will a defendant be entitled to attorney fees and costs.  There *must* be a specific finding that the suit was "frivolous."

Wisconsin law differs from the statutes of most other states.  Recovery of attorney fees in privacy cases is automatically authorized to the prevailing party by Cal. Civ. Code § 3344(a), Okla. Stat. Tit. 12, § 1449(A), and R. I. Gen. Laws § 9-1-28.1(b).  *See*, RESTATEMENT (THIRD) OF THE LAW UNFAIR COMPETITION § 49(1), comment *f* (1995).

Research has disclosed no reported case in Wisconsin where a plaintiff in a privacy suit has been required to pay attorney fees as a sanction under § 995.50(6).  Stayart will therefore rely on the imposition of sanctions under Section 1988 and Section 285, the most analogous federal statutes, for which there is abundant case law.  And since § 995.50(6) operates as a sanction, the statute "must be strictly construed in favor of the one against whom the penalty is imposed and is never extended by construction."  *Sarkis v. Allstate Ins. Co.*, 863 So. 2d 218, 223 ( Fla., 2003) (construing Florida offer of judgment statute as a sanction where it awards attorney fees to a defendant when a plaintiff unreasonably rejects a settlement).

Wis. Stats. § 995.50(6) must also be interpreted in light of the Supreme Court's decision in *Professional Real Estate Investors, Inc. v. Columbia Pictures, Inc.*, 508 U.S. 49 (1993). There, the Supreme Court explained that the right to bring and defend litigation implicates First Amendment rights.  Bringing allegedly frivolous litigation may only be sanctioned if a suit is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits."  508 U.S. at 60.  Obviously, an unjustified large fee award could have a "chilling"

effect on a plaintiff. *See, e.g., Hershinow v. Bonamarie*, 772 F. 2d 385, 395 (7th Cir. 1985) (emphasizing the chilling effect large awards would have on plaintiffs).

An erroneous fee sanction carries economic and reputational consequences. As noted in *Medtronic Navigation, Inc. v. Brain LAB Medizinische Computersysteme GmbH*, 603 F. 3d 943, 953 (Fed. Cir. 2010), involving Section 285:

> Despite our reluctance to second-guess the judgment of trial judges who typically have intimate knowledge of the case, we have the responsibility, in light of the substantial economic and reputational impact of such sanctions, to examine the record with care to determine whether the trial court has committed clear error in holding the fee award. Where we have found error, we have reversed exceptional case findings and vacated attorney fee awards based on those findings.

## ARGUMENT

1. <u>Google's Fees Belie Its Hindsight Argument That Stayart's Suit Is Frivolous.</u>

Google's claimed legal fees amply show that Stayart's suit is not frivolous.

In moving for attorneys' fees, Google claims that it has incurred "about $64,344 in attorney fees" according to Jennifer L. Gregor on March 22, 2011 (Document 53, at 4).

But on March 15, 2011, Stayart's counsel spoke to another attorney representing Google, James D. Peterson, by telephone. On this occasion, Mr. Peterson admitted that Google's attorneys' fees were between $115,000 and $130,000. Mr. Peterson *twice* said that this was the amount Google would be seeking from the court unless Stayart immediately waived her right to appeal to the Seventh Circuit. *See*, Declaration of Gregory A. Stayart, attached as Exhibit 3.

The Seventh Circuit has explained that the more time and effort a defendant spends, the less likely the case is frivolous, and that a fee award is appropriate to a prevailing defendant. *Hamilton v. Daley*, 777 F. 2d 1207, 1214 n. 7 (7th Cir. 1985). *Cf. In Re TCI*, 769 F. 2d 441, 448 (7th Cir. 1985) (defendants need not incur substantial costs on a "preposterous" case).

On this basis, there is no way Stayart's suit can be characterized as "frivolous." Either Google's attorneys' fees are *twice* the amount ($64,000) or *four* times the amount ($130,000) previously awarded in Wisconsin for invasion of privacy in *Pachowitz, supra*, and *Poston, supra*.[1] The trial court awarded fees of $30,460 and $33,806.90, respectively, in those cases.

And the gross disparity in Google's fees compared to these court-approved awards cannot be justified by the simple explanation that lawyers for Google may charge higher hourly rates. Here, there was *no* discovery and *no* trial. In these other privacy cases in Wisconsin, there was full discovery, pre-trial motions, a trial, and post-trial motions.

    2.       Stayart's Suit Raises An Important Issue of First Impression Requiring Judicial Resolution.

This suit involves the use of Stayart's name and image on the internet in connection with the placement of paid advertising. This is by virtue of Google's AdWords program. In effect, Stayart is the victim of identity theft, thanks to Google.

Whether a person has any legal recourse when his or her name is used for advertising purposes on the internet is an emerging issue which has received little attention from the courts.

A key factor used by reviewing courts to determine whether a district court abused its discretion in awarding attorney fees to a prevailing defendant under Section 1988 is whether a suit raised an issue of first impression requiring judicial resolution. *Munson v. Friske*, 754 F. 3d 683, 696 (7th Cir. 1985); *Reichberger v. Pritchard*, 660 F. 2d 280, 288 (7th Cir. 1981).

---

[1] A motion for attorney fees "must state the amount or provide a fair estimate of the amount sought." Rule 54(d)(2)(B), F.R.C.P. Attorneys for Google cannot agree on the amount sought. In an oral discussion on March 15, 2011, Google's fees were stated to be between $115,000 to $130,000, while in a written submission to the court on March 22, 2011, Google's fees were stated to be "about $64,344."

5

This is an important case, not only for Stayart, but for other citizens of Wisconsin. The filing of Stayart's case against search giant Google attracted considerable attention in the popular press, as well as in the legal profession. *See*, Exhibits 4 through 7, attached hereto.[2]

As noted by Marguerite S. Dougherty, *The Lanham Act: Keeping Pace With Technology*, J. L. & POLICY 455, 455 (1998-1999) (footnote omitted):

> Electronic commerce has exploded in recent years. As a result of the Internet's astounding growth, intellectual property offenses have been magnified

As well stated by the California appellate court in another context:

> The issue presented here involves a question that has arisen only with the advent of Internet communications. Application of the common law to matters involving the Internet is of considerable interest.

*Varian Medical System, Inc. v. Delfino*, 6 CalRptr. 3d 325, 113 Cal. App. 4th 273 (6th Dist. 2003), *opinion superseded*, 85 P. 3d 444, 10 Cal. Rptr. 3d 536, *rev'd on other grounds*, 25 Cal. Rptr. 3d 298, 106 P. 3d 958 (2005).

This case also presents novel questions potentially affecting nonparties. In addition to Wisconsin, over forty other states where Google does business recognize the right of privacy/publicity, either at common law or by statute.

The Wisconsin Legislative Council's staff brief concerning Wisconsin's privacy bill (now § 995.50) speaks in the broadest terms about the importance of protecting privacy interests:

> Man's need for privacy is rooted in biology . . . As human societies evolved from communal to modern, the emphasis on individuality and achievement generates a new and psychologically compelling need for privacy.

---

[2] The court is asked to take judicial notice of these articles from the internet per Fed. R. Evid. 201(b)(2). Documents publically available on the internet can be submitted as evidence, if otherwise relevant, provided they identify (1) the date of publication or the date the document was accessed and printed, and (2) its source (*e.g.*, a URL). *Safer, Inc. v. OMS Investments, Inc.*, 94 U.S.P.Q. 2d 1031 (TTAB Feb 23, 2010). *See generally, Shrover v. New Cingular Wireless Servs., Inc.* 498 F. 3d 976 (9th Cir. 2007).

6

Wisconsin Legislative Council Staff Brief 76-4, *Privacy of Personal Information* 1 (June 3, 1976), quoted in Bradden Becker, *The Scope of Wisconsin's Privacy Statute*, WISCONSIN LAWYER 23, 25 (September 2003).

The law desires to protect an individual's right to control the commercial use of his or her name and likeness. *Apple Corps Ltd. v. A.D.P.R., Inc.*, 843 F. Supp. 342, 349 (M.D. Tenn. 1993). Such protection is socially beneficial because it encourages people to develop special skills, which can then be used for commercial advantage. *Mathews v. Wozencraft*, 15 F. 3d 432, 437 (5th Cir. 1994).

Despite the clear importance of privacy, and the enactment of § 995.50, there are only a handful of reported decisions in Wisconsin dealing with the misappropriation of a person's name or picture for advertising or trade. None of these cases involve the internet.

Wisconsin is not unique. Cases on the right of privacy/publicity are exceedingly rare. Courts frequently look to the entire available body of case law when resolving such suits. *See, e.g., Cheatham v. Paisano Publications, Inc.*, 891 F. Supp. 381, 385 (W.D. Ky. 1995) (looking to federal law because Kentucky had not articulated the right's specific elements); *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 162 (1989) (noting the general policy of maintaining uniformity in intellectual property laws); *Facenda v. NFL Films Inc.*, 488 F. Supp. 2d 491, 502 (E.D. Pa. 2007) (identifying only *one* published decision involving statutory right of privacy/publicity in Pennsylvania).

Even the United States Supreme Court has accepted only one right of privacy/publicity case for review, *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562 (1977).

The basic intent of law, and by legislation and court decisions, is to provide a remedy for wrongs suffered and a fair opportunity to be heard. *Rawson v. Sears Roebuck & Co.*, 678 F.

7

Supp. 820, 823 (D. Colo. 1988). If a suit is filed to vindicate important rights, as Stayart has

done, it cannot be filed for an improper purpose, such as in bad faith or to harass a defendant.

Just as courts have an "absolute duty . . . to hear and decide cases within their jurisdiction"

(*United States v. Will*, 449 U.S. 200, 215 (1980)), "litigants have a corresponding due process

right to have their cases decided when they are properly before the federal courts" (*Comer v.*

*Murphy Oil USA*, 607 F. 3d 1049, 1060-61 (5th Cir. 2010)) (*en banc*).

"In a changing area of law, attorneys should not be penalized for failure to foreknow the

extent of the relief a court will grant. Vigorous advocacy of opposing points of view is the heart

of the adversary system of justice." *Wheeler v. Durham City Board of Educ.*, 88 F.R.D. 27, 33

(M.D.N.C. 1960) (citing cases).

Where the law is developing rather than settled, courts are far less likely to find that a

litigant has filed a suit in "bad faith." This principle has been acknowledged both by

commentators and the courts.

*See*, James A. Romanyak & Gregory A. Stayart, *Rules and Procedures: The Advent of*

*Rule 11*, ABA TORT & INS. L. J. (Winter 1988) 438, 445 (dealing with Rule 11, F.R.C.P.):

> Where unfavorable law is "crystal clear" rather than unsettled, Rule 11
> sanctions are more likely to be imposed . . . Conversely, where the area of law
> is in flux, sanctions are less likely to be imposed (citations omitted).

*And see*, *e.g.*, *CJC Holdings, Inc. v. Wright & Lato, Inc.*, 989 F. 3d 791 (5th Cir. 1993)

(trial court should not impose Rule 11 sanctions for advocacy of plausible legal theory,

particularly where law is unclear; sanctions will chill counsel's enthusiasm and stifle creativity

of litigants in pursuing novel factual or legal theories); *In re Carraher*, 971 F. 2d 327 (9th Cir.

1992) (imposition of sanctions against debtor's counsel was erroneous where issue was

undecided in circuit and counsel's argument had logical appeal); *Jones v. Slater Steels Corp.*,

8

660 F. Supp. 1570 (N.D. Ind. 1987) (male steelworker who failed to show *prima facie* case of reverse discrimination not subject to Rule 11 sanctions where legal issue was one of first impression, and parties could not agree on elements of claim); *In re Morrell*, 42 B. R. 973 (N.D. Cal. 1984) (where primary issue in appeal of bankruptcy court order had never been decided under relevant state law, appeal was not frivolous, and thus appellee who eventually prevailed on issue was not entitled to attorneys' fees).

The Wisconsin Legislature acknowledged that privacy law is subject to constant change:

> The right of privacy recognized in this section shall be interpreted in accordance with *the developing common law of privacy.*

Wis. Stat. § 995.50(3) (emphasis added).

Our legal system initially was entirely based on the common law. As stated by another author (Richard Glenn, THE RIGHT OF PRIVACY 11 (ABC-CLIO, Inc., 2003)):

> The legal system in the United States is based on the common law. The common law is the body of principles that originate from judicial decrees that reflect prevailing usages and customs. Common law is thus judge-made law, as distinguished from statutory law, which is law created by the enactment of legislatures.

The common law as discussed by Oliver Wendell Holmes (THE COMMON LAW (M. Howe ed., 1953)) consisted of contracts, criminal law, torts, bailments, wills and succession.

In modern times, only the law of torts, including privacy claims, remains part of the uncodified common law. *See*, Mark D. Rosen, *What Has Happened to the Common Law? -- Recent American Codifications, and Their Impact on Judicial Practice and the Law's Subsequent Development*, 1994 WIS L REVIEW 1119, 1123-24 and n. 7.

As the common law is judge-made law, the Wisconsin Legislature recognizes that judges have the responsibility to advance privacy rights, together with litigants and lawyers.

9

The late Justice Dooley of the Illinois Supreme Court once stated that "[o]bviously courts create law. If it were otherwise the common law would be as out of touch with life as a corpse." *Renslow v. Mennonite Hosp.*, 67 Ill. 2d 348, 361, 367 N.E. 2d 1250, 1257 (1977).

Justice Benjamin Cardozo shared a similar view concerning the judicial function:

> A rule which in its origin was made the creation of the courts themselves, and was supposed in the making to express the *mores* of the day, may be abrogated by courts when the *mores* have so changed that perpetuation of the rule would do violence to the social conscience . . . . *This is not usurpation.* It is not innovation. It is the reservation for themselves of the same power of creation that built up the common law through its exercise by the judges of the past.

B. Cardozo, THE GROWTH OF THE LAW 136-37 (Greenwood Press Reprint 1973) (emphasis added).

Since Wisconsin recognizes the right of privacy under the common law, and by statute, Wisconsin citizens should have more protection than would otherwise be the case. *See*, Judith Endejan, *The Tort of Misappropriation of Name or Likeness Under Wisconsin's New Privacy Law*, 1978 WIS L REV 1029, 1039 (footnote omitted):

> The new privacy statute combines specific enumerations of actionable invasions of privacy with a general acknowledgement of the developing common law of privacy. Hence the Wisconsin statute seems to go beyond statutes in other jurisdictions . . . .

3.      Stayart's Suit Is Based On A Real Threat of Injury to Her.

Whether a lawsuit sets forth a real threat of injury to the plaintiff is another criterion reviewing courts use in deciding whether a district court abused its discretion in awarding fees under Section 1988 to a prevailing defendant. *Munson v. Friske, supra; Reichberger v. Pritchard, supra.*

This element is clearly present here.

The internet is a unique medium which provides a greater outlet for exploitation of a person's name and likeness than other media. Every day, people all over the world "surf" the

Case 2:10-cv-00336-LA   Filed 04/26/11   Page 10 of 32   Document 76

internet for information on every possible topic – from medical diseases to travel itineraries to new recipes to gossip from Hollywood.

In *Welling v. Weinfeld*, 866 N.E. 2d 1051, 1058-59 (Ohio 2007), the Ohio Supreme Court said:

> Today, thanks to the accessibility of the Internet, the barriers to generating publicity are slight, and the ethical standards regarding the acceptability of certain discourses have been lowered. As the ability to do harm has grown, so must the law's ability to protect the innocent.

Another court in Virginia cautioned:

> In that the Internet provides a virtually unlimited, inexpensive, and almost immediate means of communication with tens, if not hundreds, of millions of people, the dangers of its misuse cannot be ignored.

*In re Subpoena Duces Tecum to American Online, Inc.*, 2000 WL 1210372 (Va. Cir. Ct.), *rev'd on other gds*, 261 Va. 350, 542 S.E. 2d 377 (Va. Sup. Ct. 2001).

Many more people will be exposed to internet publications compared to more traditional forms of media because internet postings are accessible for a potentially indefinite period.

*See, Bursac v. Souzzi*, 868 N.Y.S. 2d 470, 479 (N.Y.S.Ct. 2008):

> It cannot be disputed that an Internet website, which simultaneously publishes and broadcasts pictures and text locally and globally, with a click of the finger, is a technological phenomenon. Any person with a computer terminal, in any part of the world, can instantly access . . . [a] website . . . . [I]nformation . . . [on that website] may be readily available to any prospective employer, casual acquaintance, potential landlord, creditor, Internet thief or predator . . . . The Internet has no sunset and postings on it will last and be available until some person purges the website, perhaps in decades to come.

The interaction between privacy/publicity and the internet also complicates matters. *Cf.* Daniel Nemet-Nejat, *Hey, That's My Persona!: Exploring the Right of Publicity for Blogs and Online Social Networks (Student Note)*, 33 COLUM. J. L. & THE ARTS 113, 113 (2009):

> Trying to encapsulate the right of publicity in the United States is like trying to grab a live fish with Vaseline-coated fingers. The slippery nature of

11

this right is even more pronounced in the context of the Internet, where personae have become both more prevalent – through blogs and online social networks (OSNs) like Facebook – and more difficult than ever to define.

Technological changes in publishing have often been the catalyst for the establishment, extension, or reinterpretation of the rights of privacy/publicity. As technological innovation impacts our private lives in newer and more invasive ways, the common law must shift to protect us from such changes.

The right of privacy was initially suggested by Louis Brandeis (later a Supreme Court Justice) and Samuel Warren after a Boston newspaper ran a story giving the personal details of a dinner party hosted by Samuel Warren's wife. William L. Prosser, *Privacy*, 48 CAL. L. REV. 383, 383 (1960).

Brandeis and Warren blamed this type of invasive publication on "recent inventions" which threatened the integrity of the persona. "Instantaneous photographs and newspaper enterprise," they said, "have invaded the sacred precincts of private and domestic life; and numerous mechanical devices threaten to make good the prediction that 'what is whispered in the closet shall be proclaimed from the house-tops.'" Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*, 4 HARV. L. REV. 193, 195 (1890).

At the time of their article, Brandeis and Warren thought invasions of privacy could only occur through written or printed publications. But after radio became popular in the 1930s and 1940s, courts had to eliminate the distinction between printed and oral publication in deciding privacy claims. Prosser, *supra*, at 394. This happened again in the 1950s and 1960s with the invention of television and the massive expansion of the film industry in Hollywood.

Because of the *real* threat of harm to her, Stayart moved for a preliminary injunction to put a stop to Google's repeated misappropriation of her name and pictures to sell ads for sexual

dysfunction drugs, other remedies and medicines, as well as a host of other products and businesses.  Google's advertisers include a company selling penis pumps, a bar in Kenosha, Wisconsin, and a drug company supplying methadone (a cure for heroin addiction).  These businesses have nothing to do with either "bev stayart" or "levitra," yet their "Sponsored links" ads appear on search result pages on Google after entering the "suggested search" touted by Google – "bev stayart levitra."  There are also "Sponsored links" ads for "bev stayart wine," 'bev stayart liquor bottle" and "greg stayart alcohol."  *See*, Document #11, May 27, 2010, at 10-18 and attachments thereto).[3]

Stayart documented at least **1,970** "sponsored links" ads on the pages "bev stayart levitra" displayed on Google's website (*see,* Memorandum of Law in Support of Preliminary Injunction, Document #10, May 27, 2010, at 1).  But you would never know this from reading the court's decision of March 8, 2011, dismissing Stayart's complaint.  Unfortunately, the court completely failed to address, or erred in its analysis of, the factual and technological issues raised by Stayart's complaint and motion.  Google is not simply indexing websites!

This omission by the court is not surprising as the law has always been slow to catch up with technology.  *See*, Michael L. Rustad & Thomas H. Koenig, *Cybertorts and Legal Lag:  An Empirical Analysis*, 13 S. CAL. INTERDISC. L. J. 77, 80 (2003);  Jo Napolitano, *Hold It Right There, and Drop That Camera*, N. Y. Times, Dec. 11, 2003, at G1 ("[T]echnology has developed at the speed of light and American law is 'stuck in the Stone Ages.'"  (quoting Barry Steinhardt, Dir. of ACLU Tech. and Liberty Program).

Because new technology occurs with such speed, any preconceived notions must be abandoned until the law has a chance to catch up.  *See, e.g.* Professor Eric Goldman, *Deregulating Relevancy in Internet Trademark Law*, 54 EMORY L. J. 507, 532, 542 (2004):

---

[3] Greg Stayart, Stayart's attorney, is a teetaler.

[I]t is 100% wrong to treat search engines as passive agents for publishing content.  Search engines are media companies, not neutral providers of information.

               \*       \*       \*

Because search engines so liberally redeploy content to accomplish their objectives, a third party (like a plaintiff or a judge) cannot make any assumptions about why content is presented by a search engine.  . . .  *One should abandon any legal presumptions about why a search result or an ad appears to a searcher.  This inquiry is resolvable only by reference to the facts and the facts change constantly.*  (emphasis added) (footnote omitted).

In sum, there is no objective evidence in the record, and Google offers none, that Stayart's suit was brought in bad faith or for harassment.  The amount of Google's legal fees amply shows that her complaint has merit;  raises a novel question under Wisconsin law requiring resolution;  and is premised on a real threat of injury to her.

Courts must presume that complaints are filed in good faith because they are drafted by lawyers as "officers of the court."  *Cf. Brooks Furniture Manufacturing, Inc. v. Detailier International, Inc.*, 393 F. 3d 1378, 1382 (Fed. Cir. 2005) (noting that courts recognize a "presumption that the assertion of a duly granted patent is made in good faith");  *Peterson v. BMI Refractories, Inc.*, 938 F. Supp. 767, 773 (N.D. Ala. 1996) ("[a]ll attorneys, as 'officers of the court,' owe duties of complete candor and primary loyalty to the court before which they practice . . . .  This concept is as old as common law jurisprudence itself.").

Google's request for fees and costs stems from a contention that "we think this case is frivolous;  therefore it is frivolous!"  Google's rank speculation and conjecture are insufficient to warrant the award of *any* attorney fees or costs to Google.

*See*, for example, *Kizer v. Children's Learning Ctr.*, 962 F. 2d 608, 613 (7th Cir. 1992) (affirming a district court's decision not to impose Rule 11 sanctions on a plaintiff who had failed to make out a *prima facie* case under Title VII because the claim was not filed with improper motives or inadequate investigation).

14

4.    Stayart's Suit Has An Arguable Basis in Law and Equity.

In moving for its attorneys' fees and costs, Google *twice* urges that Stayart has "no authority from Wisconsin or any other jurisdiction to support her claim" (Mem. of Law, Document 53, at 1-2, 6).

Google wishes to create the impression that Stayart's suit must be frivolous if it is not supported by precedent.  This is not the law.  In so arguing, Google seriously misstates the law.

A claim can be found to be reasonable, and *not* frivolous, if no precedent directly contradicts a litigant's position.

Thus, the Freedom of Information Act requires federal agencies to make records and documents publicly available upon request, subject to certain exemptions.  The statute also contains a fee-shifting provision.[4]  If the government withholds certain records, and litigation ensues, the plaintiff may be entitled to an award of attorney fees and costs if the government's position is later found not to have been reasonable.

*See, Frydman v. DOJ*, 852 F. Supp. 1497, 1504 (D. Kan. 1994) where under this statute the court held:

> Although the government did not offer case authority to support its position regarding the [refusal to disclose records], we believe the government's position had a colorable basis.  There is little, if any, case authority which directly holds contrary to the government's position.

Similarly, the District of Columbia Circuit has upheld a district court's finding of reasonableness in another FOIA case.  No fees were awarded where there was "no clear precedent on the issue" (*Tax Analysts v. DOJ*, 965 F. 2d 1092, 1096-97 (D.C. Cir. 1992)), even though the district court's decision in favor of the agency's withholding was reversed

---

[4] 5 U.S.C. § 552(a)(4)(E)(1) (2006), amended by OPEN Government Act of 2007, P. L. No. 110-175. 121 Stat. 2524.

15

unanimously by the court of appeals, which, in turn, was affirmed by a near-unanimous decision by the Supreme Court (*Tax Analysts v. DOJ*, 492 U.S. 136 (1989)).

A correct statement of the law regarding fee sanctions was given by a federal judge in Chicago in *Badillo v. Central Steel & Wire Co.*, 114 F.R.D. 615, 628 (N.D. Ill. 1983). In civil rights cases, courts have generally awarded attorney fees to a prevailing defendant only where the plaintiff proceeds in the face of an unambiguous adverse ruling, or where the plaintiff "is aware with some degree of certainty of the factual or legal infirmities of his claim."

Applying this test, rather than the test wrongly given by Google, Google cannot receive any award of attorney fees or costs. Stayart did not file suit against Google in defiance of an unambiguous adverse ruling. Substantial precedent exists, completely ignored by Google.

*See, Doe v. Friendfinder Network, Inc.*, 540 F. Supp. 2d 288 (D. N.H. 2008) *rehearing denied* 2008 US Dist LEXIS 38177. See, Exhibit 8. The plaintiff, a middle-aged New Hampshire woman living near Dartmouth College, alleged that operators of adult web communities, which connected members through online personal ads, had made a bogus personal profile of her. The profile included a biography and a nude photo. Portions of her profile appeared as advertisements and "teasers" on other internet websites, without her permission. This was in an effort by the operators to increase the profitability of their businesses.

These allegations were sufficient to state a claim for invasion of privacy under New Hampshire law under an appropriation theory. *The court expressly rejected the argument that because the plaintiff was a non-celebrity, her claim was deficient.* 540 F. Supp. 2d at 306.

*See, Standard Process, Inc. v. Total Health Discount, Inc.*, 559 F. Supp. 2d 932 (E. D. Wis. 2008) (Judge J. P. Stadtmueller). *See*, Exhibit 9.

16

A business dispute arose between two competitors in the health care industry who sold dietary supplements on the internet. Standard Process brought multiple claims against Total Health under the Lanham Act and Wisconsin law.

Total Health was allegedly selling plaintiff's trademarked supplements without authorization by creating the false suggestion that it was affiliated with the plaintiff. It purchased the plaintiff's name ("standard process") as a keyword from search engines, and thereby received prominent placement of its paid ads in search results for Standard Process products.

The court denied a motion for summary judgment by Total Health, explaining that the defendant's scheme could falsely give consumers the impression that it was a favored or authorized Standard Process reseller when, in fact, it was not. 559 F. Supp. 2d at 938-39.

*See, Stayart v. Yahoo! Inc.*, 651 F. Supp. 2d 873 (E. D. Wis. 2009) (Chief Judge Rudolph Randa). *See*, Exhibit 10. Stayart alleged that two internet search engines, Yahoo and Overture Services, knowingly connected her name to three sexual dysfunction drugs on their search results for her. 651 F. Supp. 2d at 879.

The court held that she could not pursue a false affiliation claim under § 43(a) of the Lanham Act, and declined to retain supplemental jurisdiction over her related claims for misappropriation of her name under the Wisconsin privacy statute, because it was more efficient for Stayart to litigate these claims in state court. *See*, Exhibit 10, pp. 888-889. In his opinion in reviewing her state law claims, Judge Randa said:

> [i]t appears that Stayart could state a claim based upon a pure appropriation theory, as distinguished from a pure right to publicity theory (footnote omitted).

*See*, Exhibit 10, p. 887.

Judge Randa, in this opinion, further stated:

> [t]he Court cannot say with certainty that a potential right to publicity claim under

17

Wisconsin law is without merit, meaning that the intellectual property exception could save Stayart's claims.

*See*, Exhibit 10, p. 888.

*See*, *Conrad v. Madison Festivals, Inc.*, 2009 WL 3018031 (W. D. Wis.). *See*, Exhibit 11. Chief Judge Barbara Crabb in Madison held that a performer at family events relating to children's health and wellness stated a cause of action for invasion of privacy under both Wisconsin common law and § 995.50(2)(b). In her opinion, Judge Crabb stated:

> Plaintiff's allegations that defendants . . . "cashed in" on her image as the Banana Lady in its advertising is sufficient to state a claim of right of publicity under Wisconsin law. *Hirsch*, 90 Wis. 2d at 397, 280 N.W. 2d 129 ("All that is required is that the name clearly identify the wronged person."); 5 McCarthy at § 28:7.

*See*, Exhibit 11, at *5.

*See, Global Law, L.L.P. v. Google, Inc.*, Case No. CV 08 5147 (U.S.D.C., N.D. of Calif., November 12, 2008) (*see*, Exhibit 12).

A San Francisco law firm and Google AdWords client sued Google, alleging various claims under the Lanham Act and California law. The firm claimed that when it entered its name "Global Law, LLP" on Google's search engine, the first search result on this page stated "Global Law, LLP" but also displayed a "Sponsored links" ad on this page to a competing law firm.

*See, Stratton Faxon v. Google, Inc.*, Case No. NNH-CV-50312195 (Conn. Superior Ct., May 27, 2009) (*see*, Exhibit 13). A New Haven, Connecticut law firm alleged that, without plaintiff's consent, Google sold the unique names "Stratton Faxon" and "Stratton Faxon law firm" to a competing law firm. When a potential client uses those search terms on Google's search engine, "Sponsored links" ads for Silver, Golub and Teitell ("SGT"), a competitor, appear on the search results pages.

18

With reference to the facts, Stayart's complaint is certainly not "a dense thicket of confusing allegations" (Mem. of Law, Document 53, at 2).

The complaint is perfectly straightforward. It clearly alleges that Google uses Stayart's name to sell advertising, called "Sponsored links," and then displays that advertising on the results of Google searches. Google owns and operates a commercial advertising program called AdWords. To participate in AdWords, Google's commercial customers bid on particular words or phrases (known as "keywords") that then trigger the display of "Sponsored links" adds when web users perform Google searches for those keywords. What is exactly confusing?

Search engines are dependent on revenue from advertising. Google allegedly makes 97% of its revenue from selling advertising through its AdWords program. *Rescuecom Corp. v. Google, Inc.*, 562 F. 3d 123, 126 (2d Cir. 2009). Search engine advertising is a multi-billion dollar industry in the United States. *See*, Frank Rose, "Microsoft Bid for Yahoo Is All About Big-Budget Advertising," *Wired Mag.*, March 4, 2008 (there is currently a $8 billion industry for search engine advertising).

In addition to AdWords, Google also employs a Keyword Suggestion Tool, a program that recommends keywords to advertisers to purchase. *Rescuecom, id.*

Stayart's complaint asserts that Google recommended and sold the keyword phrase "bev stayart levitra" to advertisers. The complaint further asserts that Google does *not* own the rights to use Stayart's name for purposes of advertising or trade, any more than it owns the right to use the trademark levitra® for purposes of advertising or trade.

There is no dispute that Stayart is a Wisconsin citizen and a "living person" entitled to bring a claim for invasion of privacy against Google.

There is also no dispute that Google's AdWords program is a form of internet advertising. *See, e.g. Hearts on Fire Company, LLC v. Blue Nile, Inc.*, 603 F. Supp. 2d 274 (D. Mass. 2009); *Boston Duck Tours, LP v. Super Duck Tours, LLC*, 527 F. Supp. 2d 205 (D. Mass. 2007), *rev'd on other grounds*, 2008 WL 244480 (1st Cir. June 18, 2008).

The only real question is whether Google violated Wisconsin law by misappropriating Stayart's name (and pictures) to display "Sponsored links" ads.

Stayart's complaint was filed on *April 20, 2010.* As of that date, Stayart was aware, with some degree of certainty, of the factual and legal merits of her claim.

In this regard, "hindsight is not the vantage point from which to evaluate the legitimacy of a particular litigation strategy." *Computer Docking Station Corp. v. Dell, Inc.*, 547 F. Supp. 2d 948, 953 (W.D. Wis. 2007) (Chief Judge Barbara Crabb), *aff'd*, 519 F. 3d 1366 (Fed. Cir. 2008). Rather, a district court must "discuss the specific information that formed the basis for the plaintiff's suit, and . . . explain why the information did not constitute adequate factual substance . . . ". *Coates v. Bechtel*, 811 F. 2d 1045, 1051 (7th Cir. 1987).

Wis. Stats. § 995.50(2)(b) prohibits the "use", for purposes of advertising or for purposes of trade, the name, portrait or picture of any living person, without prior written consent.

On November 19, 2009, Habush, Habush & Rottier, one of Wisconsin's oldest and largest law firms, filed suit against a competitor, Cannon & Dunphy. Suit was filed in the Circuit Court of Milwaukee County, Case No. 09-CV-018149. *See,* Exhibit 14.

Also named plaintiffs were the firm's principals, Robert L. Habush and Daniel A. Rottier.

The suit alleges that internet search engines, including Google and Yahoo, generate a substantial amount of revenue by allowing advertisers to purchase the use of keywords, with the

result that when a search engine user enters those purchased keywords, the advertiser's ad and website link will be displayed on the user's computer screen. *See*, Exhibit 14, ¶ 22.

The suit alleges that Cannon & Dunphy and the principals in the firm, William M. Cannon and Patrick O. Dunphy, have purchased from Google and Yahoo the keywords "Habush" and "Rottier" without the permission of the plaintiffs. As a result of the purchase of these keywords, an internet user in the Milwaukee metro area, who searches using the keywords "Habush" or "Rottier" or "Habush Habush & Rottier", is confronted with an advertisement and website link to Cannon & Dunphy. *See*, Exhibit 14, ¶ 23.

The suit further alleges that the defendants' use of the names of Mr. Habush and Mr. Rottier, in this manner, violates § 994.50(2)(b). Exhibit 14, ¶¶ 27-32.

This case was assigned to Judge Charles F. Kahn, Jr. of the Circuit Court of Milwaukee County. The defendants moved to dismiss the complaint. A hearing was held on this motion on March 10, 2010. At this time, Judge Kahn granted, in part, the motion to dismiss, and denied, in part, the motion to dismiss, following oral argument.

Judge Kahn held that the firm of Habush Habush & Rottier was not a proper plaintiff because it was not a "living person" under § 995.50(2)(b). Judge Kahn further held that Mr. Habush and Mr. Rottier had stated a claim for misappropriation of their names under the statute.

It is counsel's understanding that Judge Kahn's ruling is not in the form of a written order. However, his ruling can be independently corroborated by other subsequent documents in this litigation.

On March 22, 2010, the defendants filed their Answer and Affirmative Defenses to the complaint. *See*, Exhibit 15. Note specifically Affirmative Defense 1 (Exhibit 15, at 3):

1.    Plaintiffs have failed to join all parties necessary to a complete adjudication of this matter pursuant to Wis. Stat. § 803.03, including

21

but not limited to Google Inc., Yahoo! Inc. and Microsoft Corporation.

On April 21, 2010, the defendants filed a motion for reconsideration of Judge Kahn's March 10, 2010 ruling. The notice accompanying this motion (Exhibit 16) refers to Judge Kahn's ruling that "the individual plaintiffs in this case have stated a claim for relief" (Exhibit 16, at 1).

Similarly, on May 11, 2010, the plaintiffs filed a brief in response to defendants' motion for reconsideration. *See*, Exhibit 17. This pleading (Exhibit 17, at 1) references that:

> Defendants have asked the Court to reconsider its March 10, 2010 ruling that the individual Plaintiffs Robert L. Habush and Daniel A. Rottier have stated a claim for relief under the Wisconsin Privacy Statute.

Stayart's counsel was made aware of the *Habush* litigation and Judge Kahn's ruling of March 10, 2010 *prior* to filing Stayart's complaint on April 20, 2010. Stayart's counsel relied, in part, on the *Habush* litigation as part of his pre-litigation investigation of the law with regard to invasion of privacy in Wisconsin**.**

Records retained by Stayart's counsel show that on April 3, 2010, he was fully aware of the *Habush* litigation. This was more than *two weeks* before Stayart's complaint was drafted and filed on April 20, 2010.

Thus, on *April 3, 2010*, Stayart's counsel accessed and printed out a number of articles on this case from the internet, including *two* separate articles from the Milwaukee Journal Sentinel (Exhibit 18, dated November 19, 2009 and Exhibit 19, dated December 9, 2009). On *April 3, 2010,* Stayart's counsel also accessed and printed out *three* other articles and blogs about this case (Exhibits 20, 21 and 22). The actual date of April 3, 2010 on which Stayart's counsel accessed and printed out all of these articles and blogs appears at the bottom of each article and blog.

Stayart's counsel accessed and printed out *three* additional articles about this *Habush* litigation from the internet on June 28, 2010. *See*, Exhibits 23, 24 and 25. Finally, Stayart's counsel accessed and printed out yet another article about this case on November 11, 2010 from www.uslaw.com. *See*, Exhibit 26. Again, the actual dates on which these articles were accessed and printed out by Stayart's counsel appear at the bottom of each document.

Google's lawyers have their headquarters in Milwaukee, Wisconsin. *See*, Exhibit 27. They cannot help but be aware of this *Habush* litigation and the March 10, 2010 ruling. The suit and its progress have received wide, documented press coverage in Milwaukee, chiefly because the Habush firm (Exhibit 14, ¶ 3) also has its main office in Milwaukee. Stayart Law Offices has its headquarters in Elkhorn, Wisconsin, approximately *70 miles* from Milwaukee, yet Stayart's counsel and Stayart have been aware of the *Habush* litigation since April 3, 2010!

Despite their knowledge of the March 10, 2010 ruling in *Habush*, Google's lawyers arrogantly filed an inane motion for attorney fees and costs. Their motion is a waste of counsel's time, as well as a waste of this court's time.[5]

Google's motion for attorney fees and costs is a classic example of a frivolous pleading, filed solely for purposes of intimidation and harassment. This blatant misconduct demands the severest sanctions from this court. Apparently, "[w]hen faced with a 'must win' case, [a lawyer's] officer of the court role falls by the wayside." Mariane M. Jennings, *The Model Rules and the Code of Professional Responsibility*, 1996 WIS L REV 1223, 1228.

Google repeatedly stubbornly misstates the law, as well. For example, we are told (Mem. of Law, Document 53, at 6):

---

[5] In *Dominquez v. Figel*, 626 F. Supp. 368, 374 (N.D. Ind. 1986), a court noted in 1985, a single hour spent by a federal judge on a case costs taxpayers $600. In a 1995 opinion, the court calculated that the hourly rate had risen to $836 by 1994. *Active Products Corp. v. A. H. Choitz & Co., Inc.*, 163 F.R.D. 274, 278 n. 5 (N.D. Ind. 1995). In 2011, the cost is probably $1,200 or more.

> [R]ight of publicity cases uniformly require a direct commercial use of
> a person's name or likeness in order to satisfy the element concerning
> "use for advertising purposes or for purposes of trade."

Wisconsin's privacy law does *not* require that, in order for there to be a "use" for commercial purposes of Stayart's name, her name must appear "in" or "on" the advertisement which Google displays through the sale of the keyword phrase "bev stayart levitra." This is *not* a requirement in the *Habush* litigation, *not* a requirement in Stayart's case, and *not* a requirement anywhere else! *Cf. Flores v. Mosler Safe Co.*, 164 N.E. 2d 853, 857 (N.Y. 1959) ("A use for advertising purposes has been defined as a use in, *or as part of*, an advertisement or solicitation for patronage" (citation omitted; emphasis added). The Wisconsin privacy statute is modeled after the New York Civil Rights Act (*i.e.,* privacy statute) which was interpreted in *Flores*.

The Ninth Circuit has explained in two cases, "[t]he right of publicity does not require that appropriation of identity be accomplished through particular means to be actionable" (*White v. Samsung Elecs. America*, 971 F. 2d 1395, 1398 (9th Cir. 1992)) and "[w]e must be acutely aware of excessive rigidity when applying the law to the Internet context; emerging technology requires a flexible approach." *Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F. 3d 1036, 1054 (9th Cir. 1999).

Google's unsubstantiated musings continue when it urges that because this court found Stayart's allegations "implausible" they must also be frivolous (Mem. of Law, Document 53, at 7). Another judge at another time in another courtroom could well find these very same or similar allegations to be meritorious. Indeed, Judge Joseph N. LaPlante did so in New Hampshire in the *Doe* case, and Judge Stadtmueller, Chief Judge Randa, Chief Judge Crabb and Judge Kahn all did so in Wisconsin!

Google also irrationally berates Stayart's counsel for what it calls "unsuccessful [prior] lawsuits against Yahoo" (Mem. of Law, Document 53, at 7).

The issue before the court is whether Stayart's present suit against Google has a colorable basis in law or equity. This case must be decided upon its own merits.

Google's characterization is also unjustified based on the results of both Yahoo cases.

In Stayart's first lawsuit against Yahoo, its "Sponsored search" advertising program was *never* before either the district court or the Seventh Circuit. Yahoo's program is similar to Google's AdWords program in that both search engines have unlawfully used Stayart's name as a keyword to sell advertising.

In Stayart's first lawsuit against Yahoo, the chief issue before both the district court and the Seventh Circuit was whether Stayart had standing to pursue a false designation of origin claim under § 43(a) of the Lanham Act.

At the time of filing suit, Stayart had a good faith belief she could pursue her Lanham Act claims. *Cf. Doe v. Friendfinder Network, Inc.*, 540 F. Supp. 2d 288, 305-06 (D. N.H. 2008).

Stayart also had claims for invasion of privacy under Wisconsin law in her first suit against Yahoo. Chief Judge Randa declined to exercise supplemental jurisdiction over these claims, leaving Stayart free to re-file them in state court in Wisconsin. And in reviewing these state claims, Judge Randa indicated in *dicta* (*supra*, at 17-18) that such claims possessed merit.

There was *no* "unsuccessful" result in Stayart's first case against Yahoo.

In Stayart's second case against Yahoo, its "Sponsored search" advertising program was at issue. Prior to filing suit, Stayart's counsel wrote to Yahoo's counsel on December 18, 2009 to complain about Yahoo's repeated misappropriation of Stayart's name in the phrase "bev

25

stayart levitra." A lawsuit was mentioned if Yahoo did not immediately remove this content. *See*, Case No. 10-C-0043, *Stayart v. Yahoo! Inc.*, Complaint, Document 1, Exhibit 15.[6]

Yahoo's counsel ignored Stayart's letter of December 18, 2009, and Stayart, understandably, therefore filed suit against Yahoo on January 19, 2010, a month later.

By a letter dated February 11, 2010, sent to Stayart's counsel, Yahoo's counsel stated that Yahoo has a "block" to prevent a person's name from appearing as a suggested search with the sexual dysfunction drugs "Cialis®" and "Viagra®". However, Yahoo did not have a similar "block" to prevent a person's name from appearing as a suggested search with the sexual dysfunction drug "Levitra®". *See, id.*, Reply in Support of Defendant's Motion to Dismiss, Document 16-1).

Yahoo's counsel also acknowledged that, as a result of Stayart's lawsuit against Yahoo, "Yahoo! has now blocked the search term 'Levitra' from appearing as a 'search assist' or 'see also' phrase in combination with [bev stayart], regardless of whether Yahoo!'s search algorithm would otherwise generate that suggestion in response to a user's input of such a query." *See*, Yahoo's counsel's letter (Document 16-1) page 2, first full paragraph. For the convenience of the court, the original of this same letter is attached hereto as Exhibit 28.

There was *no* "unsuccessful" result in Stayart's second case against Yahoo because Yahoo admitted it had deliberately violated its own internal policy to prevent the misappropriation of Stayart's name, and has removed the violating content.

Finally, Google attacks Stayart because of her personal relationship with her attorney (Mem. of Law, Document 53, at 7-8). There is apparently no end to Google's abuse.

---

[6] A court may take judicial notice of public records from other proceedings. *Comms. Co. v. Bell Atl. Corp.*, 407 F. 3d 1220, 1222 (D.C. Cir. 2005). This is especially true here because Stayart's second suit against Yahoo is a "related case" already before the court.

Google relies on an *unpublished* opinion over *thirty* years old, *Hanson v. American Bankers Ins.*, 101 Wis. 2d 736, 306 N.W. 2d 308 (1981). The court there found that a reasonable attorney would have known that a cause of action assertedly against a bank was without a reasonable basis. However, the attorney's representation of his wife and himself apparently clouded his judgment.

The *Hanson* case is distinguishable. Here, counsel's judgment is not clouded and he is not representing himself. Stayart's counsel independently determined that Google has violated Wisconsin law, based on at least *seven* other similar cases, *four* of which are directly from Wisconsin. Any reasonable attorney would have objectively and dispassionately concluded that Google's business model violates Wisconsin law. A defendant who builds a business model based upon clear violation of the law faces liability. *eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058 (N.D. Cal. 2000).

Further, attorneys, as members of the bar, have an implicit ethical obligation to ensure access to the courts and to justice. This obligation does not change because a potential client is their spouse or another family member. *See, Zlystra v. Safeway Stores, Inc.*, 578 F. 2d 102, 105 (5th Cir. 1978) (noting that "[o]rdinarily there would be objection to an attorney representing his wife in litigation"); *Srour v. Srour*, 733 So. 2d 593, 593 (Fla. Dist. Ct. App. 1999) (stating that "[t]here is no prohibition against a lawyer representing himself, yet alone a family member").

5. Google's Motion for Fees and Costs Is Sanctionable Under 28 U.S.C. § 1927 Because It Is Objectively Baseless.

Google's conduct, in filing an objectively baseless motion for attorneys' fees and costs, is itself sanctionable pursuant to 28 U.S.C. § 1927. Under this provision, an attorney who "multiplies the proceedings . . . unreasonably and vexatiously," may be ordered to personally satisfy the expenses caused by his conduct. *Knorr Brake Corp. v. Harbil, Inc.*, 738 F. 2d 223 (7th

27

Cir. 1984). "If a lawyer pursues a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound, the conduct is objectively unreasonable and vexatious." *In re TCI*, 769 F. 2d 441, 445 (7th Cir. 1985) (citation omitted).

This is not the first time Google has recklessly filed motions for attorneys' fees and costs, with no chance of success, but only to harass and intimidate.

In *Hyperphrase Technologies, LLC v. Google, Inc.*, Case No. 06-CV-199, U.S.D.C. (W.D. of Wis.), a patent infringement action, Google's AutoLink and AdSense products were accused of infringing four patents of the plaintiff. Judge Shabaz in Madison granted summary judgment for Google, finding no infringement, based on his construction of the term "data reference." Google then sought a finding that the case was "exceptional" under Section 285. On February 15, 2007, Judge Shabaz summarily denied Google's request for such a finding and attorney fees. He explained (Exhibit 29, at 2-3):

> There is virtually no evidence that this case was brought in bad faith. Defendant's support for its motion on this point consists almost exclusively of hindsight reliance on the summary judgment decision in its favor. An objective view of the entire file and the conduct of this litigation suggests to the contrary that plaintiff commenced the action in good faith believing that it could prevail on the broad claim construction it advanced. To award fees in this instance would be to convert § 285 into a routine fee shifting statute.

The plaintiff appealed the case to the Court of Appeals for the Federal Circuit. Part of Judge Shabaz's construction of the term "data reference" was later found to be erroneous. The matter was then remanded for further proceedings.

Additional proceedings took place before Chief Judge Barbara Crabb in Madison, who again granted summary judgment to Google on the basis of non-infringement. Google brought a second motion for attorney fees, but Judge Crabb, on May 12, 2009, again found that the case remained unexceptional. Judge Crabb explained (Exhibit 30, at 3):

Case 2:10-cv-00336-LA   Filed 04/26/11   Page 28 of 32   Document 76

Defendant argues that plaintiffs' conduct on remand amounts to bad faith litigation because plaintiff (1) opposed defendant's motion to amend to add a license defense; (2) too vigorously disputed defendant's proposed findings of fact; (3) mischaracterized the federal circuit's construction of "data reference"; (4) offered new expert opinions after remand; and (5) continued to pursue their willfulness claim. To the contrary, plaintiff's litigation conduct was typical vigorous representation -- no less reasonable or more vigorous than the positions and arguments of defendant.

In May, 2009, Google also sought $3.75 million in attorney fees in a case in Texas. So did Yahoo, without specifying the fee amount. *See, PA Advisors, LLC v. Google, Inc., et al.*, Case No. 2:07-cv-480-RRR. Summary judgment was entered in favor of Google and Yahoo on a claim that they had infringed a software patent.

In denying attorney fees under Section 285, Judge Randall R. Rader of the United States District Court for the Eastern District of Texas, Marshall Division, held (*See*, Exhibit 31, at 3):

> Google and Yahoo argue that this case is exceptional because the plaintiff: (1) had no basis for asserting patent infringement; (2) abused the discovery process by seeking irrelevant and burdensome discovery; and (3) engaged in litigation misconduct by paying off a witness.
>
> This case does not merit exceptional status. Google and Yahoo's request for sanctions based on payments to a witness was already denied. In addition, reviewing the record as a whole, including discovery, none of the tactics used by nXn were abusive. Discovery was contentious and hard fought by both sides but the requests made by nXn were within normal course of conduct in software disputes. And although the court wholeheartedly endorses the disposition of this case on summary judgment, it does not make the claims entirely baseless. Google and Yahoo's motion for attorneys' fees under 35 U.S.C. § 285 is therefore **DENIED**.

Google then sought attorney fees under 28 U.S.C. § 1927, but this request was likewise summarily denied by Judge Rader (*id.*):

> Google further requests attorneys' fees based on unreasonable and vexatious conduct by nXn's attorneys. Under 28 U.S.C. § 1927, "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." "This requires that there be evidence of bad faith, improper motives, or reckless disregard of the duty owed to the court." *Edwards v. General Motors Corp.*, 153 F. 3d 242, 246 (5th Cir. 1998).

As highlighted above, the tactics employed by nXn's attorneys were not unreasonable or vexatious.  <u>nXn's attorneys pursued legal theories they believed in on behalf of their clients.</u>  Moreover, there is no indication that nXn's attorneys acted in bad faith or with improper motives.  Google's motion for attorneys' fees under 28 U.S.C. § 1927 is therefore **DENIED** (emphasis added).

Most recently, Google again sought its legal fees of $660,000 as a prevailing defendant in a patent infringement case.  *See, iLOR v. Google, Inc.*, 631 F. 3d 1372 (C. A. Fed. 2011).  And Google was rebuffed for the *fifth straight* time.  The Court of Appeals for the Federal Circuit held (Exhibit 32, at 14):

As we held in the first appeal, iLOR's claim construction was incorrect. but simply being wrong about claim construction should not subject a party to sanctions where the construction is not objectively baseless.

Google has demonstrated a clear intent to litigate its meritless motions for sanctions indefinitely.  Google shows no signs of stopping these wasteful campaigns.  Despite consistent rulings against Google regarding the shifting of attorney fees to its adversaries, Google has attempted to do so yet again against Stayart.  Google itself should be sanctioned, pursuant to 28 U.S.C. § 1927, to finally stop this insanity!

## CONCLUSION

For the reasons set forth above, Stayart respectfully requests that this court deny in its entirety Google's Motion for Attorneys' Fees and Costs.  Stayart also respectfully requests that Google be sanctioned pursuant to 28 U. S. C. § 1927.

Respectfully submitted,

BEVERLY STAYART

By      /s/ Gregory A. Stayart

*Counsel for Beverly Stayart*

Gregory A. Stayart
STAYART LAW OFFICES

30

N5577 Cobblestone Road
Elkhorn, Wisconsin  53121-3820
(262)745-7395

**CERTIFICATE OF SERVICE**

I hereby certify that, on April 26, 2011, I electronically filed with the clerk of the court

the preceding Beverly Stayart's Memorandum of Law in Opposition to Google's Motion for

Attorneys' Fees and Costs, using the ECF System which will automatically send notification of

such filing to Google's counsel:

jpeterson@gklaw.com
jgregor@gklaw.com

/s/ Gregory A. Stayart